UNITED STATES of America, Appellee,

v.

Steven E. ROGERS, Defendant–
Appellant.

No. 1184, Docket 92–1111.

United States Court of Appeals,
Second Circuit.

Argued April 1, 1993.

Decided Nov. 16, 1993.

Michael S. Devorkin, New York City (Doar Devorkin & Rieck, of counsel), for defendant-appellant.

Nelson W. Cunningham, Asst. U.S. Atty., New York City (Roger S. Hayes, U.S. Atty. S.D.N.Y. of counsel), for appellee.

Before OAKES, PIERCE and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

Steven E. Rogers appeals from a judgment of conviction, entered after a jury trial in the United States District Court for the Southern District of New York (Charles S. Haight, Jr., *Judge*). Rogers was convicted of conspiring to commit wire fraud and to transport fraudulent securities in interstate or foreign commerce, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; and transporting a fraudulent security in interstate or foreign commerce, in violation of 18 U.S.C. § 2314. For the reasons set forth below, we affirm in part and reverse in part, and remand to the district court.

## BACKGROUND

Steven E. Rogers was the Director of International Operations of Trend International, a subsidiary of the Trend Group. Leonard Hoffman was Vice President of Administration and oversaw the finances of Trend Group in Connecticut. Trend Group was primarily a financial services business and Lease Trend, one of its subsidiaries, was mainly in the business of leasing equipment, which it had purchased, to end users of the equipment. The lessee submitted an application to Lease Trend and agreed to make periodic payments once the equipment was delivered, installed and accepted. To obtain financing for the purchase of the equipment, Lease Trend borrowed money from a funding source, such as a bank. The funding source, in turn, would get a security interest in the equipment and an assignment from Lease Trend of the payments it was to receive from the lessee.

In July 1984, Trend Group established a one-year, $2 million revolving line of credit with Banque de L'Union Europeenne ("BUE"), a French bank, to finance equipment lease transactions. To draw upon the line of credit, Trend Group was to present a complete lease package, including a lease signed by the lessee and a letter from a financing source stating that it would lend money for permanent financing of the equipment. The money BUE lent to Trend Group was to be partial financing for the purchase of the equipment, to pay the manufacturer while he finished installing the equipment. Trend Group was permitted to borrow the funds from BUE for 180 days.

Rogers and Hoffman were the individuals at Lease Trend responsible for administering the BUE line of credit. As of August 15, 1984, Trend Group had tendered signed leases it had on hand to borrow approximately $950,000 from BUE. Despite this, by the end of August 1984, Trend Group had, according to Hoffman, "almost zero cash in the company." Hoffman testified that he reported this to Rogers and the two of them agreed to submit falsified lease packages to BUE

and to borrow money on this collateral. Hoffman constructed phony lease packages and brought them to Rogers, who signed his own name on behalf of Trend Group and forged the signatures of the lessee where required. Hoffman and Rogers submitted fifteen to twenty phony lease packages. By March 1985, Trend Group had exhausted its $2 million line of credit with BUE, and there was no possibility of drawing further on the line of credit. Trend Group began falling behind on interest payments for both the phony and legitimate leases, as some of both types of leases remained in BUE's possession longer than the 180 days permitted under the revolving credit line. In late March 1985, Christiane Godchaux, whose duties included loan administration and documentation at BUE, began requesting the payment of back interest and explanations of why the older leases had not been repaid within 180 days.

Hoffman responded in a series of letters and telexes. He testified that he was "stalling for time." In these communications, Hoffman falsely represented the status of the phony lease packages and stated false excuses for the late payments. Hoffman discussed these series of communications with Rogers before sending each of them out. In one telex, sent on June 4, 1985, Hoffman falsely stated that several leases held by BUE for nearly a year were experiencing installation problems, and he set out a schedule of when the equipment covered by the leases should be installed. In a letter dated June 6, 1985, Hoffman offered to exchange four older legitimate leases for a new phony lease. He then forwarded a phony lease package with Focus 4, Inc., a California printing concern, as the lessee. In the lease package, Rogers had forged the signatures of Focus 4 officials. Hoffman testified that this lease package was sent out so that Trend Group would not have to repay BUE $191,000 then owing on the four older leases. BUE permitted the exchange of the four older leases with the Focus 4 lease. Through June 1985, Godchaux continued to request from Trend Group payment of unpaid interest and principal. On June 25, 1985, Hoffman sent her another telex falsely stating that the leases in BUE's possession would be taken out in ac-

cordance with the schedule set out in the June 4, 1985 telex.

Trend Group never repaid the $2 million it had borrowed under the line of credit with BUE. BUE sued and obtained a judgment against Lease Trend, and made efforts to collect on the leases it held as collateral. Prior to indictment, Rogers executed for the prosecution's benefit a written waiver of the statute of limitations for any offenses committed on or after May 30, 1985.

On June 12, 1990, a four-count indictment was filed against Rogers and Hoffman. Count One charged them with conspiring to commit wire fraud, in violation of 18 U.S.C. § 1343, and conspiring to transport forged and fraudulent securities in interstate and foreign commerce, in violation of 18 U.S.C. § 2314. The objects of the conspiracy were the creation by Rogers and Hoffman of a scheme to defraud investors to obtain money and property by means of false and fraudulent representations and promises using wire communications, and the transportation of forged securities in interstate commerce. The indictment alleged that the conspiracy was achieved by the defendants and their co-conspirators via the forging and creation of fictitious equipment leases which were provided to BUE, as collateral, to induce BUE to advance monies to Lease Trend; and that the defendants and their co-conspirators forged and created fictitious equipment leases and assorted documentation, and provided them to BUE so that Lease Trend would not have to repay earlier loans. Listed also as overt acts were: Hoffman's sending of telexes from Lease Trend's Connecticut office to Paris, France, on June 4 and 25, 1985; Rogers' causing a letter to be sent from Lease Trend to Godchaux at BUE on June 6, 1985; and that on June 6 and 21, 1985, Hoffman caused letters to be sent from Lease Trend to Godchaux at BUE. Count Two charged Rogers and Hoffman with committing wire fraud through a telex wire communication on approximately June 4, 1985, in violation of 18 U.S.C. § 1343, and Count Three charged them with committing wire fraud through a telex wire communication on approximately June 25, 1985. Under Count Four, Rogers and Hoffman were charged with transporting

a fraudulent security in interstate commerce on or about June 6, 1985, in violation of 18 U.S.C. § 2314.

Prior to trial, Rogers moved to dismiss Counts One through Three, claiming that the alleged conspiracy had terminated in March 1985 and that prosecution under the conspiracy and substantive wire fraud counts was barred by the five-year statute of limitations, 18 U.S.C. § 3282. He moved also to dismiss Count Four because the Focus 4 lease was not a security within the meaning of 18 U.S.C. § 2311. In an order dated January 24, 1991, the district court denied his motion, ruling that the statute of limitations had not lapsed, and that the Focus 4 lease was a security as a matter of law. Also, the court denied Rogers' request for a hearing to offer testimony on the question of whether the equipment lease named in Count Four was a security.

On January 2, 1991, Hoffman pleaded guilty to Count Four of the indictment and agreed to testify on behalf of the Government at Rogers' trial. On January 7, 1991, the Government moved to disqualify as Rogers' attorney, Gary D. Rafsky, Esq., who is Rogers' son. In its memorandum of law in support of the motion, the Government asserted that in preparation for trial it had recently discovered that Rafsky had represented Hoffman at a 1986 deposition in connection with a civil lawsuit arising out of the same facts; that it anticipated that Hoffman would be a key trial witness against Rogers; and that this created a conflict of interest for Rafsky. The Government argued that Rafsky, in representing Rogers and cross-examining Hoffman, would unfairly rely upon confidential attorney-client communications he received from Hoffman, and that Rafsky, to avoid becoming a fact-witness at trial, might limit his cross-examination of Hoffman, which might impair his representation of Rogers.

A hearing was held the next day, at which Hoffman joined in the Government's motion. After hearing the Government's presentation, the judge asked Rafsky his "perception" on the motion for his disqualification. Rafsky responded:

I do believe it's clear that there is a conflict in my representation, particularly in light of the fact that having just learned that Mr. Hoffman will be a key witness and in that regard, while I am not happy with the prospect of disqualification, I understand what the obligations are and would have to concur with the government in that respect.

Rafsky also stated that when he had suggested to Rogers the possibility of continuing to represent him, but not to cross-examine Hoffman, Rogers had decided against such a limitation. After a brief discussion, the court excused Rafsky from the case as Rogers' primary attorney. The Assistant United States Attorney then stated: "Mr. Rogers is in court, and I should note for the record that he has been present throughout this entire proceeding." The judge then instructed Rogers that he could apply for the appointment of counsel, if warranted under his present economic circumstances. Thereafter, John Burke, Esq., was appointed, pursuant to the Criminal Justice Act, as substitute counsel.

On January 24, 1991, Burke raised the issue of whether Rafsky would be able to assist in Rogers' defense "in any way possible with the exception of the cross examination or anything to do with Mr. Hoffman in this matter." The district court issued an order the next day addressing that issue. In that order, the court directed that in any consultation between Rafsky, as former counsel to Rogers, and Burke, as successor counsel, Rafsky was not to reveal and Burke was not to inquire into any confidential information or secrets Rafsky had obtained during his previous representation of Hoffman. Burke was also not to engage in any discussions referring to that representation with Rogers or anyone else on the defense team.

On June 3, 1991, Rogers' jury trial began. Prior to the selection of the jury, Burke requested that Rafsky be permitted to sit at counsel table and that, with respect to the prior deposition, if the Government wanted "to make an issue out of it that he represented Mr. Hoffman, that's their business." The district judge ruled that Rafsky could sit at counsel table and that the Government would

be permitted to elicit that Hoffman was represented at the deposition by Rafsky. Hoffman was the only witness who testified that Rogers was involved in the crimes. During Hoffman's testimony, the Government elicited that Rafsky was Lease Trend's corporate attorney, that he had attended the deposition with Hoffman, and that before the deposition Rogers told Hoffman: "Don't do anything to hurt yourself." Hoffman stated that he believed that Rogers meant he was to protect himself and that if he had told the truth during the deposition he would not have been protecting himself. On cross-examination, Hoffman stated that he lied approximately twenty to thirty times during the deposition. After the Government rested, Rogers did not put on a defense case, but defense counsel moved for a judgment of acquittal. The court denied the motion.

In its instructions to the jury, the court charged that the Focus 4 lease was a security as a matter of law, and the court, without objection, charged the jury that it had to consider whether the communications alleged to have occurred after May 30, 1985, were designed to lull BUE into a false sense of security, postpone its ultimate complaint to the authorities and make the apprehension of Rogers less likely than if those communications had not taken place. The jury returned with verdicts of guilty on all counts. On February 18, 1992, Rogers was sentenced to concurrent terms of four years' imprisonment on Counts One and Two; and to concurrent terms of five years' probation on Counts Three and Four, to be commenced following his imprisonment. A mandatory special assessment was imposed upon each count. Rogers is now serving his sentence. This appeal followed.

## DISCUSSION

On appeal, Rogers contends that his convictions under Count One—the conspiracy count—and Counts Two and Three—the substantive wire fraud counts—were barred by the statute of limitations. He notes that, in accordance with *Grunewald v. United States,* 353 U.S. 391, 396, 77 S.Ct. 963, 969, 1 L.Ed.2d 931 (1957), the Government had to prove beyond a reasonable doubt that he was

responsible for an act, on or after May 30, 1985, that was executed in furtherance of a continued main object of the alleged scheme. Rogers maintains that the trial evidence established that Lease Trend drew its last funds from BUE in March 1985 and that the indictment did not allege, either as an object or a means of the scheme, an agreement by the co-conspirators to conceal the alleged conduct, either before or after the main objects of the conspiracy were accomplished. Consequently, he argues that the sending of the telexes in June 1985 was not charged as part of the original conspiracy and that the prosecution should not have been permitted to rely upon that evidence.

*Grunewald v. United States* considered the statute of limitations in conspiracy prosecutions. The Supreme Court stated:

[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.

353 U.S. at 397, 77 S.Ct. at 970 (footnote omitted). *Grunewald* noted that "a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Id.* at 405, 77 S.Ct. at 974 (emphasis in original). "Thus, the life of a conspiracy cannot be extended for statute of limitations purposes by acts of concealment occurring after the conspiracy's criminal objectives have been fully accomplished even if those acts are 'done in the context of a mutually understood need for secrecy.'" *United States v. Fletcher,* 928 F.2d 495, 499 (2d Cir.) (quoting *Grunewald,* 353 U.S. at 402, 77 S.Ct. at 972), *cert. denied,* —— U.S. ——, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991).

█ We disagree with Rogers' contention that the statute of limitations barred his prosecution under Count One. Count One herein charged that Rogers and Hoffman conspired to, *inter alia,* commit wire fraud,

and that the sending of the telexes in June 1985 was part of that conspiracy. In the context of wire fraud, the Supreme Court has stated that mailings occurring after the receipt of goods obtained by fraud are within the statute if those mailings were designed "to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Lane,* 474 U.S. 438, 451–52, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986) (citations and internal quotation marks omitted). In this case, based upon the evidence presented at trial, the jury could have properly found that the conspiracy to commit wire fraud, which was charged in Count One of the indictment, was not complete until after the June 1985 telexes were submitted to BUE. As such, the June 1985 communications listed in Count One were overt acts of the conspiracy that took place within the statute of limitations. *See United States v. Elkin,* 731 F.2d 1005, 1008–09 (2d Cir.) (fraudulent verification letter sent to Government two years after defendant had received improperly obtained money from Government was part of scheme to defraud Government), *cert. denied,* 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984). Similarly, prosecution of Rogers for wire fraud, under Counts Two and Three of the indictment, was not barred by the statute of limitations because the June 1985 communications could properly be considered by the jury to have been designed to lull BUE into not discovering the alleged fraud. *Lane,* 474 U.S. at 451–52, 106 S.Ct. at 733.

■ Rogers also challenges the sufficiency of the evidence under Counts Two and Three. According to him, there was insufficient evidence of an intent by him to join Hoffman in sending the June telexes. He argues that the Government did not prove that, within the statute of limitations, he personally sent or instructed anyone to send telexes on June 4 and 25, 1985.

We do not agree. Under the wire fraud statute, the Government was required to prove beyond a reasonable doubt that Rogers caused a wire communication to be transmit-

ted for the purpose of executing his scheme to defraud. *See* 18 U.S.C. § 1343. For purposes of the wire fraud statute, "an act [can be] caused not simply when it was a physical consequence of the person's conduct but when, in addition, the actor either knew the consequence would occur or its occurrence was reasonably foreseeable." *United States v. Muni,* 668 F.2d 87, 89–90 (2d Cir.1981) (footnote omitted).

Herein, Hoffman testified that in late August 1984 he reported to Rogers that there was almost no cash in Lease Trend, that the two of them agreed to submit falsified lease packages to BUE as collateral, and to borrow money on this collateral. Hoffman thereafter composed phony lease packages and Rogers forged the signatures of the lessee, where required, on these documents. After Lease Trend had submitted these leases and exhausted its line of credit and began falling behind on interest payments, BUE began requesting the payment of back interest. Hoffman then sent out a series of telexes, including communications on June 4 and 25, 1985, which falsely represented the status of the phony lease packages and misrepresented reasons for the late payments. He testified that he discussed both of these communications with Rogers before sending them out. Based upon this evidence, the jury could have found beyond a reasonable doubt that Rogers was consulted prior to when the challenged communications were sent out, that these communications were integral to the scheme to defraud BUE, of which Rogers was a part, and that these communications were a reasonably foreseeable part of the scheme. *United States v. Keats,* 937 F.2d 58, 64 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991).

■ Next, Rogers argues that he was denied his sixth amendment right to counsel of choice. Rogers claims that Rafsky was not subject to disqualification because there was no previous attorney-client relationship between him and Hoffman, since Rafsky was representing Lease Trend, and not Hoffman at the deposition. Rogers also claims that he did not waive his sixth amendment right to counsel because in considering the Government's motion to disqualify Rafsky, the dis-

trict court failed to advise him personally of his right to counsel and to question him personally.

A criminal defendant's sixth amendment right to counsel of choice is circumscribed in several important respects. For instance, a defendant may not "insist on the counsel of an attorney who has a previous or on-going relationship with an opposing party, even when the opposing party is the Government." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). Nor can a defendant insist upon being represented by an attorney "where the attorney in question is potentially in a position to use privileged information obtained during prior representation of the movant." *United States v. James,* 708 F.2d 40, 45 (2d Cir.1983) (quotation marks and citations omitted).

Rogers is correct that, when Hoffman testified at the deposition, it was on Lease Trend's behalf, *see* Fed.R.Civ.P. 30(b)(6), and that it was not Hoffman but Lease Trend, the corporation, on whose behalf Rafsky appeared. Accordingly, Lease Trend was the client and the holder of any attorney-client privilege with respect to any information Rafsky may have obtained in relation to the deposition. *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348–49, 105 S.Ct. 1986, 1990–91, 85 L.Ed.2d 372 (1985). The record does not indicate Lease Trend's position regarding the possible use by Rafsky, in his defense of Rogers, of information obtained during his employment at Lease Trend. Our observation in *United States v. Cunningham,* 672 F.2d 1064, 1072 (2d Cir.1982), is equally pertinent here:

> No case has been called to our attention, and we are aware of none, in which an attorney has been disqualified on grounds of conflicting prior representation solely at the behest of a person other than the former client or its privy.... '[A]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification.' The refusal to disqualify in the absence of a motion by the former client is all the more appropriate in the context of a

criminal prosecution with its implication of constitutional rights.

(quoting *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 88 (5th Cir. 1976) (footnotes omitted)). We believe, however, that in this case, Hoffman, as an employee at Lease Trend when he was deposed, should be considered a privy of the company. As such, his joinder in the motion to disqualify Rafsky was sufficient to assert the adverse nature of his interest in the confidences he may have disclosed to Rafsky vis-à-vis Rogers' continued representation by Rafsky, and presented the district judge "with a plain duty to act" on the disqualification motion. *Yarn Processing,* 530 F.2d at 89. In this Circuit, when faced with a motion to disqualify a criminal defendant's attorney, and the defendant indicates that he desires to waive his right to representation by an attorney without a conflict of interest, a district court must:

> (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

*United States v. Iorizzo,* 786 F.2d 52, 59 (2d Cir.1986) (citation omitted). We have also stated that motions for disqualification should be made pre-trial. *Id.*

■ We reject Rogers' contention that his right to counsel was violated because the district court failed to advise him personally of his right to counsel and to question him personally prior to disqualifying Rafsky. The record supports the district court's conclusion that Rafsky could no longer participate as Rogers' primary attorney, but that he could, with certain limitations, continue to assist in Rogers' defense. Upon discovering that Rafsky, as corporate counsel, and Hoffman, an employee of Lease Trend, had attended a deposition in connection with a civil lawsuit arising out of the same facts, the government moved to disqualify Rafsky. At a hearing on the motion, Rafsky agreed to

withdraw, stating "while I am not happy with the prospect of disqualification, I understand what the obligations are and would have to concur with the Government in that respect." He also stated that Rogers had considered and previously rejected the possibility of Rafsky continuing to represent him, but not cross-examining Hoffman. It would have been preferable for the court to personally address Rogers, who was present in the courtroom during the entire proceeding, to insure that he had been properly advised of his constitutional rights. Although Rogers was not questioned as to Rafsky's imminent disqualification, the district court did not abuse its discretion in disqualifying Rafsky. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Thus, where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that [a] defendant[ ] be [represented by conflict-free counsel]." *Wheat,* 486 U.S. at 160, 162, 108 S.Ct. at 1697, 1698.

Rogers contends that the district court denied him his sixth amendment right to a jury trial on each issue of fact when it decided as a matter of law that the Focus 4 leases were "securities," and so charged the jury.

■ We agree with Rogers' claims on this issue. A trial court's decision not to charge the jury on all the elements of a charged crime is an error that has the effect of relieving the prosecution of its burden of proving every element beyond a reasonable doubt. *United States v. Smith,* 939 F.2d 9, 10–11 (2d Cir.1991) (per curiam) (citing *Francis v. Franklin,* 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985)). As the Su-

preme Court noted recently, in reversing a conviction entered after the jury was given constitutionally deficient instructions:

> The [sixth amendment right to a jury trial] includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of "guilty." Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the [prosecution], no matter how overwhelming the evidence.

*Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993) (citation omitted).

Section 2314 prohibits the transportation in commerce of stolen goods, wares, and merchandise valued at $5,000 or more, stolen securities, or falsely made, forged, altered, or counterfeited securities. The term "security," as used in § 2314, is defined in 18 U.S.C. § 2311.[1] Herein, the district court relied upon *United States v. Wexler,* 621 F.2d 1218 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980), to rule against Rogers. In *Wexler,* we held that the defendants, by conceding the issue at trial, had waived their ability to challenge in this Court the issue of whether the equipment leases therein were "securities" within the meaning of §§ 2311 and 2314. *Id.* at 1222–23. In any event, we went on to state that "securities are 'instruments which have *intrinsic value* and *are recognized and used as such in the regular channels of commerce,*'" *id.* at 1223 (citing *United States v. Canton,* 470 F.2d 861, 864 (2d Cir.1972)) (emphasis in original), and that "it appears that the decision in each case depends upon the particular facts of that case." *Id.* at 1224 n. 4. We then analyzed the trial evidence and concluded that "each

---

1. Section 2311, in part, provides:

    "Securities" includes any note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; valid or blank motor vehicle title; certificate of interest in property, tangible or intangible; instrument

    or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or, in general, any instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing, or any forged, counterfeited, or spurious representation of any of the foregoing ...

equipment lease in this case is the type of instrument Congress intended to and did include in the definition contained in § 2311." *Id.* at 1225.

We believe that it may have been proper for the court to determine preliminarily whether or not an item could possibly be a security. *See Canton*, 470 F.2d at 862 (New York motor vehicle certificate not "security" as defined in § 2311); *cf. In re Vericker*, 446 F.2d 244, 248 (2d Cir.1971) (FBI documents not "goods," "wares" or "merchandise" under, *inter alia*, § 2314). But once the court concluded that the Focus 4 leases may have been securities, then, provided there was sufficient evidence in the case and upon timely request, Rogers was entitled to have the judge instruct the jury on what a security is and to let the jury decide whether the items at issue were securities. *See United States v. Johnson*, 718 F.2d 1317, 1323–25 (5th Cir. 1983) (en banc). The district court prevented Rogers from presenting evidence in support of his claim that the Focus 4 leases were not securities, declined to instruct the jury on this issue, and the indictment did not set forth an alternative theory of prosecution for Rogers' alleged violation of § 2314. *See United States v. Jackson*, 576 F.2d 749, 756 (8th Cir.), *cert. denied*, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978). We therefore conclude that Rogers suffered a "structural error" in the trial process and that his conviction under Count Four must be reversed, and remanded to the district court for appropriate proceedings. *Sullivan*, — U.S. at ——, 113 S.Ct. at 2083; *Smith*, 939 F.2d at 11.

We do not agree with Rogers' further contention that a reversal on Count Four affects his convictions under Counts One through Three. Count One charged a conspiracy, the objects of which were to commit wire fraud and to transport forged and fraudulent securities in commerce. Counts Two and Three charged Rogers with substantive wire fraud. Thus, although we reverse Count Four, which supported one of the objects of the conspiracy, the indictment alleged, and the jury found, that Rogers engaged in other conspiratorial conduct, namely, the sending of a telex on approximately June 4, 1985 with intent to defraud (Count Two) and the sending of a telex on approximately June 25, 1985 with intent to defraud (Count Three). Thus, Rogers' convictions under Counts One through Three are unaffected. *See Brennan v. United States*, 867 F.2d 111, 114–16 (2d Cir.) (affirming general jury verdict finding conspiracy to violate and substantive RICO violation predicated upon wire fraud and violations of the Travel Act, despite subsequent invalidation by the district court of the wire fraud convictions because "[t]he very same telephone calls that formed the basis of *every* separate wire fraud count also formed the basis of a Travel Act count.") (emphasis in original), *cert. denied*, 490 U.S. 1022, 109 S.Ct. 1750, 104 L.Ed.2d 187 (1989).

## CONCLUSION

We find no merit in the remaining issues Rogers raises on appeal. We affirm the district court's judgment of conviction on Counts One through Three of Rogers' indictment, charging him with conspiracy to commit wire fraud, and substantive wire fraud. However, we reverse the district court's judgment of conviction on Count Four of Rogers' indictment, charging him with transporting a fraudulent security in interstate or foreign commerce, and remand to the district court for appropriate proceedings, because the judge was erroneous on the law.