UNITED STATES of America, Appellee,

v.

**Shawn THOMAS, Christopher Reese, Defendants–Appellants.**

Nos. 339, 340, Dockets 93–1813, 94–1054.

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1994.

Decided April 21, 1995.

Eric D. Bernstein, Asst. U.S. Atty., Brooklyn, N.Y. (Zachary W. Carter, U.S. Atty., E.D.N.Y., David C. James, Asst. U.S. Atty., on the brief), for appellee.

Michael H. Sporn, New York City, for defendant-appellant Shawn Thomas.

Ian Lowell Heller, New York City (John Jacobs, on the brief), for defendant-appellant Christopher Reese.

Before: KEARSE and WINTER, Circuit Judges, and OWEN, District Judge.*

* Honorable Richard Owen, of the United States District Court for the Southern District of New York, sitting by designation.

KEARSE, Circuit Judge:

Defendants Shawn Thomas and Christopher Reese appeal from final judgments entered in the United States District Court for the Eastern District of New York, following a jury trial before Reena Raggi, *Judge,* convicting them of possessing and uttering forged securities, in violation of 18 U.S.C. § 513 (1988), and of conspiring to do so, in violation of 18 U.S.C. § 371 (1988). Thomas and Reese were sentenced principally to 51 months' and 78 months' imprisonment, respectively, with each prison term to be followed by a three-year term of supervised release. On appeal, defendants challenge their convictions and their sentences, contending principally (a) that their convictions were based on legally insufficient theories, (b) that the district court erred in a number of its evidentiary rulings and in its instructions to the jury, and (c) that the court erred in calculating their offense levels and criminal history categories under the federal Sentencing Guidelines ("Guidelines"). The government concedes that there were errors in the criminal-history-category calculations. For the reasons below, we remand for recalculation of defendants' criminal history categories and their resulting sentences; in all other respects, we affirm.

## I. BACKGROUND

The present prosecution charged Thomas and Reese with a scheme to obtain blank American Express and Travelers Express money orders by fraudulently diverting shipments that those companies intended for their local selling agents, and then to forge and negotiate the money orders to obtain cash and merchandise. The government's evidence at trial included testimony from employees of the two money order companies and their selling agents, testimony from accomplice witnesses, and evidence from law enforcement agents who had participated in the investigation.

## A. *The Evidence*

The evidence at trial, taken in the light most favorable to the government, showed that from the spring of 1990 to early 1991, defendants diverted four money order shipments. The Fraud Manager of American Express's money order division described the diversion of shipments intended for three American Express selling agents: American News, Castle Check Cashing ("Castle"), and Slope Check Cashing ("Slope"). She testified that in April 1990, American Express received a telephone call from an individual falsely stating that American News had changed its address. In April and May 1990, on the basis of this call, American Express sent a total of 300 blank money orders, having a total face value of up to $90,000, to the false address. In June 1990, American Express received a similar call, falsely stating that Castle had changed its address. A shipment of 420 American Express money orders having a total face value of up to $210,000 was sent to the false address for Castle. In February 1991, American Express received a fax advising that Slope had changed its address. Eight hundred blank money orders having a total face value of up to $400,000 were sent to the false address for Slope. The selling agents to which these shipments were addressed never received them.

The government presented evidence that Thomas and Reese had made the false communications. Lakisha Langley, Reese's fiancée from early 1990 to early 1991, testified, *inter alia*, that while Reese was in jail (on matters unrelated to the present prosecution), he had a telephone line installed in her home with a three-way calling feature. Reese would frequently call her and have her call a number for him, and he would then speak to the person Langley had dialed from her telephone. One of the numbers that Reese had Langley call for him was the number for Slope. Others were 800 numbers, and Langley heard Reese tell the person at the number called that he needed money orders, that his old location had burned down, and that the money orders should be sent to a new address. On one occasion, Reese had Langley telephone

Thomas, and Reese instructed Thomas to send a communication by fax.

The government presented evidence from various sources that Thomas and Reese had negotiated, or attempted to negotiate, the stolen money orders. For example, on May 21, 1990, at an American Express office, Thomas attempted to cash two of the money orders diverted from American News. On June 27, 1990, Thomas paid for a COD delivery at 366 Monroe Street in Brooklyn, his residence, with seven of the money orders diverted from Castle. In early 1991, Reese, from jail, called his friend Kia Jeffries and proposed that she deposit some of the money orders in her bank account and keep a percentage of the proceeds, and that she recruit others to do the same. Jeffries testified that she agreed to do so and that she thereafter met with Thomas, who gave her 200 of the money orders diverted from Slope, each embossed in the amount of $500, for a total face value of $100,000.

A number of the other diverted American Express money orders that were negotiated were made payable to or from a "Paul Morris." Many of them also bore imprints of Paul Morris's driver's license, his American Express card, and his Beth Israel Hospital identification card. The Paul Morris to whom these documents belonged testified that he had never used American Express money orders and that in April 1990, as he was exiting from a subway train in Brooklyn, he realized that his wallet, which contained those documents, was missing. The government presented evidence that in April 1990, a car was rented by an individual other than Morris, using Morris's driver's license. That rented car was subsequently stopped by a police officer who, at trial, identified Thomas as the driver and testified that the driver, when stopped, had identified himself as Shawn Thomas.

A Customer Service Representative employed by Travelers Express ("Travelers") testified that in September 1990, Travelers received a telephone call from an individual falsely reporting that one of the Travelers selling agents, CGM Check Cashing ("CGM"), had changed its address to 242 Bainbridge Street in Brooklyn. Langley tes-

tified that she lived at that address in September 1990 and that Reese stayed there with her for two weeks. On September 13, 1990, via United Parcel Service ("UPS"), Travelers sent 5,000 money orders, having a total face value of up to $2.5 million, to the Bainbridge Street address. The UPS driver testified that while on his route about a mile from that address, he was approached by Reese who inquired about the package. He gave the Travelers package to Reese, who signed for it using the name of CGM's owner.

The government presented evidence that in December 1990, a mail order merchant received an order for more than $10,000 worth of jewelry, accompanied by some of the Travelers money orders diverted from CGM. The order specified that the jewelry was to be delivered to 366 Monroe Street in Brooklyn, which was Thomas's residence. The government also presented evidence that numerous fingerprints of Thomas and/or Reese had been found on diverted money orders and on order forms and envelopes used to purchase merchandise with the money orders.

### B. *The Convictions and Sentences*

Thomas and Reese were indicted and tried on three counts, to wit, conspiring to possess and utter forged securities, in violation of 18 U.S.C. § 371 (count one); possessing stolen securities, in violation of 18 U.S.C. § 2315 (1988) (count two); and possessing and uttering forged securities, in violation of 18 U.S.C. § 513 (count three). The jury found both defendants guilty on all three counts. As discussed in greater detail in Part II.A. below, the court thereafter dismissed count two and sentenced defendants only on counts one and three.

As discussed in Part III below, defendants were sentenced under Guidelines § 2F1.1, which established a base offense level of 6. Finding that defendants' scheme involved more than minimal planning, defrauded more than one victim, and entailed losses totaling more than $1.5 million, the court found that the enhanced offense level for each defendant was 20. Rejecting Thomas's contention that his offense level should be adjusted downward on the theory that he had played a minor role, the court concluded that Thomas's total offense level was 20. The court adjusted Reese's offense level upward two steps on the ground that he was an organizer and leader of the criminal activity, giving him a total offense level of 22. On the basis of their respective prior convictions, the court found that Thomas was in criminal history category III and that Reese was in criminal history category V.

The resulting imprisonment ranges prescribed by the Guidelines were 41–51 months for Thomas and 77–96 months for Reese. The court sentenced Thomas to 51 months and sentenced Reese to 78 months. These appeals followed.

## II. THE CHALLENGES TO THE CONVICTIONS

On appeal, defendants contend principally that their convictions should be reversed on the ground that they were based on legally insufficient theories. Alternatively, defendants argue that they are entitled to a new trial on the grounds that the court erred in its evidentiary rulings and in its instructions to the jury as to whether a money order is a security. We reject all of these contentions.

### A. *Money Orders as "Securities"*

Count two of the indictment charged defendants with, *inter alia*, having received and possessed stolen securities, in violation of 18 U.S.C. § 2315. Section 2311 of Title 18 defines the term "[s]ecurities" as used in 18 U.S.C. §§ 2311–2322 (1988) to include, *inter alia*, checks, drafts, and "in general, any instrument commonly known as a 'security.'" 18 U.S.C. § 2311. In connection with count two, the district court instructed the jury that "the money orders at issue in this case are 'securities.'" (Jury Charge at 34.)

After the jury returned its verdict finding defendants guilty on all counts, this Court handed down its decision in *United States v. Rogers*, 9 F.3d 1025 (2d Cir.1993) ("*Rogers*"), cert. denied, —— U.S. ——, 115 S.Ct. 95, 130 L.Ed.2d 45 (1994), setting aside a conviction under 18 U.S.C. § 2314 for transportation of stolen equipment leases. We noted that equipment leases are not among the instru-

ments specifically mentioned in § 2311's definition of "security," and we reasoned that whether or not they were securities within the meaning of § 2314 was thus a question of fact for the jury. We concluded that the *Rogers* trial court had erred in instructing the jury that such leases were securities within the meaning of that section as a matter of law.

In the wake of *Rogers*, the trial court in the present case noted that § 2311's definition of "[s]ecurity" also does not mention money orders. Because the court had not instructed the jury to determine whether the money orders at issue here were securities within the meaning of § 2315, it set aside defendants' convictions under that section and dismissed count two of the indictment (a dismissal as to which there has been no cross-appeal by the government). Defendants contend that because the district court also did not instruct the jury to determine whether the money orders at issue here were securities within the meaning of 18 U.S.C. § 513 but instead instructed with respect to that section that "the money orders at issue in this case are, by law, deemed securities" (Jury Charge at 41), defendants were entitled to the same relief on count three. This contention is meritless.

The question of whether a money order is a security within the meaning of § 513 is not governed by *Rogers* because the definition of security found in § 2311 does not apply to § 513. Section 2311, by its own terms, governs the sections within the chapter of Title 18 in which § 2311 is found, to wit, §§ 2311–2322. Section 513 contains its own definition of security, and that definition expressly includes "money order[s]." 18 U.S.C. § 513(c)(3)(A). Thus, the matter of whether a money order is a security within the meaning of § 513 is not a jury question; a money order is a security within that section as a matter of law. The trial court's quoted instruction with respect to § 513 was correct.

■ Defendants also contend that the district court should have instructed the jury to determine whether the instruments at issue in this case were in fact money orders. This contention is frivolous. Defendants did not ask the district court to give such an instruc-

tion, and although there could be a question in some cases as to whether a given instrument is a money order, this case was not one of them. The instruments in question, some 1,800 of which were introduced in evidence at trial, allowed the signer of the instrument to order the payment of a specified sum of money to a named individual, and each instrument was prominently imprinted with the words "**Money Order.**" Not surprisingly, the witnesses repeatedly referred to the instruments as money orders, without objection from defendants. Defendants' attorneys likewise consistently referred to the instruments as money orders. For example, in his opening statement to the jury, Reese's attorney stated: "Were money orders stolen? Yes. Were money orders forged? Yes. Did someone spend some of the money orders? Yes." (Tr. 64.) Thomas's counsel, in his closing statement to the jury, without question referred to the instruments as "these money orders." (*E.g.*, Tr. 1428, 1429, 1433.) In the charging conference, counsel for Thomas stated that defendants wished to have the jury instructed to determine whether or not some or all of "these money orders" constituted "securities within the statutory definition." (Tr. 1328.) Defendants made no request, however, to have the jury instructed to determine whether or not what they repeatedly referred to as "these money orders" were in fact money orders. The trial court's instructions assumed that the instruments were money orders, and defendants made no objection to that characterization. We conclude that no issue was raised as to whether or not these instruments were money orders and that the court was not required to pose that question to the jury.

### B. *The Scope of § 513*

■ Section 513 provides, in pertinent part, that

whoever makes, utters or possesses a forged security ... of an organization, *with intent to deceive another person, organization, or government* shall be fined not more than $250,000 or imprisoned for not more than ten years, or both.

18 U.S.C. § 513(a) (emphasis added). Defendants contend that the terms of § 513 thus

prohibit "utter[ing] or possess[ing] a forged security ... of an organization, with intent to deceive another ... organization," but do not prohibit the utterance, etc., of a forged security of an organization in an attempt to deceive the same organization. They point out that the government showed that defendants had obtained or attempted to obtain cash for 94 of the diverted American Express money orders from American Express itself and argue that the jury may have convicted them on count three on the basis of that conduct despite the fact that it did not evince an intent to deceive "another" organization. The government disagrees with this interpretation of § 513, arguing that "the term 'another' in the statute merely distinguishes *the perpetrator of the crime* from the party deceived." (Government brief on appeal at 37 (emphasis in original).) Although the language and statutory context of § 513 raise questions as to the section's scope, we conclude that there is no basis for reversal.

Linguistically, it appears that the adjective "another" was intended to be commutative, applying not only to "person" but to "organization" and "government" as well, since the last two nouns are unaccompanied by any article or modifier of their own. Were "another" to apply only to "person" and were the phrase "another person" to be deleted, the pertinent phrase would be "with intent to deceive organization." This phrasing has an awkwardness that suggests it was not what Congress intended. We are also skeptical of the government's suggestion that use of the word "another" was designed to suggest and exclude the perpetrator's potential for self-deception.

The phrase most commonly employed to include an intent-to-deceive element in a statutory prohibition is simply "with intent to defraud," usually unaccompanied by any specification as to potential targets of the fraud, and that is the phrase used in the vast majority of the sections of Chapter 25 ("Counterfeiting and Forgery") of Title 18, which comprises §§ 471–513. *See, e.g.,* 18 U.S.C. § 471 ("[w]hoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States"); *id.* § 472 ("[w]hoever, with intent to defraud, passes, [or] utters ... any falsely made, forged, counterfeited, or altered obligation or other security of the United States"); *id.* § 478 ("[w]hoever, within the United States, with intent to defraud, falsely makes, alters, forges, or counterfeits any ... security of any foreign government"); *id.* § 479 ("[w]hoever, within the United States, knowingly and with intent to defraud, utters ... any false, forged, or counterfeited ... security" of a foreign government); *id.* § 482 ("[w]hoever, within the United States, with intent to defraud, falsely makes, alters, forges, or counterfeits any bank note or bill issued by a bank or corporation of any foreign country"); *id.* § 483 ("[w]hoever, within the United States, utters, passes, puts off, or tenders in payment, with intent to defraud, any ... false, forged, altered, or counterfeited bank note or bill, mentioned in section 482"); *id.* § 484 ("[w]hoever so places or connects together different parts of two or more notes, bills, or other genuine instruments issued under the authority of the United States, or by any foreign government, or corporation, as to produce one instrument, with intent to defraud"); *id.* § 491 ("whoever, being 18 years of age or over, with intent to defraud, makes, utters, inserts, or uses any card, token [or] slug ... similar in size and shape to any of the lawful coins or other currency of the United States"); *id.* § 499 ("[w]hoever ... with intent to defraud uses or possesses" a forged or counterfeited military or official pass of the United States); *id.* § 500 ("[w]hoever, with intent to defraud, passes, utters or publishes or attempts to pass, utter or publish any ... forged or altered money order or postal note" issued by the United States Postal Service); *see also id.* §§ 477, 480, 507, 510. When Congress did expressly identify a potential fraud target in Chapter 25, other than in § 513, it did so either only in very precise terms, *see, e.g.,* 18 U.S.C. § 495 (utterance, etc., of forged deed, etc., "with intent to defraud the *United States*" (emphasis added)), or in unlimited terms, *see, e.g., id.* § 485 (utterance, etc., of forged or counterfeit coin having a value of five cents or more "with intent to defraud *any body politic or corporate, or any person*" (emphasis added)); *id.* § 490 (utterance, etc., of forged or counterfeit coin under

the value of five cents "with intent to defraud *any person*" (emphasis added)).

Section 513 is the only section in Chapter 25 that refers to an intent to deceive "another" entity, and the legislative history of the section is more confusing than enlightening. Section 513 was proposed as part of a bill that originally included what is now 18 U.S.C. § 510. *See* S. 1762, 98th Cong., 1st Sess. Title XI, Part D (1983). Section 510 uses the commonplace "with intent to defraud" formulation that had been used in the sections quoted above:

> Whoever, with intent to defraud—
>
> (1) falsely makes or forges any endorsement or signature on a Treasury check or bond or security of the United States; or
>
> (2) passes, utters, or publishes, or attempts to pass, utter, or publish, any Treasury check or bond or security of the United States bearing a falsely made or forged endorsement or signature. . . .

18 U.S.C. § 510. Though §§ 510 and 513 were enacted at different times, *see* Pub.L. No. 98–151 § 115(a), 97 Stat. 964, 976 (1983) (adding § 510); Pub.L. No. 98–473, Title II, § 1105(a), 98 Stat. 1837, 2144 (1984) (adding what is now § 513), both sections were described in the same report of the Senate Judiciary Committee. In that report, the differing phrases of §§ 510 and 513 were used, but not explained:

> Part D would add a new section [the present § 513], proscribing the making, uttering, or possession of a counterfeited or forged security of a State or political subdivision thereof, or of an organization, with intent to deceive *another* person, organization, or government. . . .
>
> . . . .
>
> Part D would also add a new section [the present § 510], to proscribing [*sic*] the forging of any endorsement or signature on a security of the United States, or the passing, uttering or publishing of any such security bearing a forged endorsement or signature, *with intent to defraud.*

S.Rep. No. 98–225, 98th Cong., 1st Sess. ("S.Rep.") 372 *reprinted in* 1984 U.S.Code Cong. & Admin.News ("USCCAN") 3182, 3513 (emphasis ours). The report contained no further elaboration as to what differences in meaning, if any, were intended between the terms "with intent to defraud" and "with intent to deceive another person, organization, or government." There was no indication as to why Congress might have meant § 513 not to prohibit attempts to defraud the issuer of the securities. Indeed, Congress indicated that, in amending Chapter 25, it was attempting to close, not open, gaps. *See, e.g.,* S.Rep. at 371, *reprinted in* USCCAN at 3512 (new § 510 "would remedy a gap in existing statutes relating to the forging of endorsements on United States securities"). Given that goal, we decline to conclude that § 513 does not reach a defendant's forgery of a security with intent to defraud the security's issuer.

■ Further, even if we accepted defendants' interpretation of § 513, there would be no basis for reversal here, for defendants did not ask the district court to instruct the jury to acquit on count three if it found that defendants' only deceitful intent was directed toward American Express with respect to American Express money orders. Accordingly, the failure to give such an instruction is reviewable only if it constituted plain error or affected substantial rights. *See* Fed. R.Crim.P. 30, 52(b); *United States v. Shaoul,* 41 F.3d 811, 817 (2d Cir.1994); *see generally United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993). Though a failure by the government to prove an element of an offense would affect substantial rights, *see, e.g., United States v. Kaplan,* 586 F.2d 980, 982–83 & n. 4 (2d Cir.1978), there was no such failure here. The 94 American Express money orders for which defendants obtained or attempted to obtain cash from American Express were but a small percentage of the 1,520 money orders stolen from that company; further, defendants have pointed to no evidence that they attempted to obtain cash from Travelers for any of the money orders stolen from Travelers. The bulk of the evidence showed defendants' intent to negotiate the forged money orders to banks and merchants, rather than to the securities' respective issuers. Jeffries, for example, was given 200 American Express money orders worth $100,000 to depos-

it, and to get others to deposit, in bank accounts; and there was a wealth of evidence that defendants used the forged money orders to defraud merchants.

In light of the ample evidence that defendants intended to deceive a plethora of victims other than the securities' issuers, we conclude that even if § 513 were interpreted to extend only to those frauds, the failure so to instruct the jury could not be considered plain error.

### C. *The Basis for the Conspiracy Convictions*

■ Count one of the indictment charged defendants with conspiring, in violation of 18 U.S.C. § 371, to (a) receive, possess, and dispose of stolen securities in violation of § 2315, and (b) make, utter, and possess forged securities in violation of § 513. Defendants contend that once the § 2315 count was dismissed, the district court erred in refusing to dismiss the conspiracy count because one of its alleged goals could not be found. We disagree.

■ An indictment charging a conspiracy to achieve two or more unlawful goals, in the conjunctive, can properly be supported by proof of any of the alleged goals. *See Griffin v. United States,* 502 U.S. 46, 56–57, 112 S.Ct. 466, 472–73, 116 L.Ed.2d 371 (1991); *Rogers,* 9 F.3d at 1033; *cf. United States v. Schiff,* 801 F.2d 108, 114 (2d Cir.1986) (with respect to alleged violations of substantive statutes worded in the disjunctive, instructions may be phrased in the disjunctive even if indictment is phrased in the conjunctive); *cert. denied,* 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987); *United States v. Cioffi,* 487 F.2d 492, 499 (2d Cir.1973) (same), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2410, 40 L.Ed.2d 774 (1974). Since there was ample proof of defendants' conspiracy to violate § 513, the district court properly refused to set aside defendants' conspiracy convictions.

### D. *Evidentiary Challenges*

Defendants make several challenges to the district court's evidentiary rulings. Their challenges lack merit. Only those below warrant discussion.

### 1. *Evidence of Prior Convictions*

Thomas had previously been convicted in Kings County, New York, of possessing in October 1990 an automobile purchased from Meteor Motors with 47 of the money orders at issue here; under state law, the car was deemed stolen because it had been bought with stolen securities. Reese had been convicted in the Eastern District of Virginia of conspiring in September 1991 to transport stolen money orders (the "Virginia conviction"). Evidence of each conviction was introduced at trial by way of stipulation between the government and the pertinent defendant. Defendants now contend that the admission of that evidence was improper. Thomas's contention appears to have been waived; neither contention has merit.

■ Under Federal Rule of Evidence 404(b), the trial court may admit relevant evidence of prior crimes for purposes other than to prove propensity to commit a crime if the court determines, in accordance with Fed.R.Evid. 403, that the evidence's probative value is not substantially outweighed by its potential for unfair prejudice. *See Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988); *United States v. Tarricone,* 996 F.2d 1414, 1421 (2d Cir.1993). Rule 404(b) permits the admission of prior-crimes evidence "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b); *see also United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.1992). If such evidence is admitted, and if requested to do so, the trial court must give an appropriate instruction to the jury explaining the limited purpose for which the evidence may be considered. *See* Fed.R.Evid. 105; *Huddleston v. United States,* 485 U.S. at 691–92, 108 S.Ct. at 1502; *United States v. Tarricone,* 996 F.2d at 1421.

When the trial court has admitted evidence pursuant to Rule 404(b) after performing the Rule 403 balancing analysis, its decision is reviewable only for abuse of discretion. *See, e.g., United States v. Tarricone,* 996 F.2d at 1422; *United States v. Pitre,* 960 F.2d at 1119. Further, if evidence was received without objection, its admission may be a

basis for reversal only if it constituted plain error. *See, e.g., United States v. Aulicino,* 44 F.3d 1102, 1109 (2d Cir.1995); Fed. R.Crim.P. 52(b). An objection that has been intentionally relinquished is not reviewable even under plain-error analysis. *See United States v. Aiello,* 771 F.2d 621, 631 (2d Cir. 1985).

In the present case, the record does not indicate that Thomas made any objection to the government's introducing the substance of his prior conviction, though he did apparently express concern about the language to be used to describe it. He eventually stipulated that the jury would be informed of it in limited terms. The record does not indicate that this stipulation was entered conditionally or that Thomas reserved any right to challenge the admission of the stipulated facts on appeal. In the circumstances, we see no reason why his stipulation should not be viewed as an intentional waiver of his right to challenge the admission of the evidence.

■ In any event, even if Thomas's present challenge was not waived, it has no merit. Thomas's prior conviction was not offered to suggest that he had a propensity to commit crime but rather was offered to rebut his attempt to show that the present investigation was defective for failure to obtain exemplars of his handwriting for comparison with handwriting on the diverted money orders. The government offered Thomas's conviction for possession of the car purchased with some of the diverted money orders at issue here in order to explain the agents' ability to connect Thomas with the money orders without the need to obtain handwriting exemplars from him. The trial court properly instructed the jury that it could consider the stipulated facts as to Thomas's conviction only with respect to why the agents did not obtain such exemplars. The court's decision to admit the evidence for this limited purpose and with this limiting instruction was not an abuse of discretion.

■ Reese's challenge to the introduction of his Virginia conviction was properly preserved by objection and by express reservation of right in the district court, but it too lacks merit. The government offered that conviction, which was for

conspiring between September 9, 1991 and September 16, 1991 to knowingly, intentionally and unlawfully transport, transmit and transfer in interstate commerce money orders, knowing them to have been stolen, converted. and taken by fraud

(Tr. 1369), as proof on the issues of Reese's knowledge and intent to deceive with respect to the money orders at issue in the present case. Reese's attorney John Jacobs, while objecting to the admission of the Virginia conviction, stated:

> MR. JACOBS: I don't believe that I can stipulate away this question of possession.
>
> THE COURT: Of knowledge and intent.
>
> MR. JACOBS: Knowledge and intent.

(Tr. 804.) Reese's conviction was thus admissible on the issues of his knowledge and intent, and the district court instructed the jury that the evidence could be considered only with respect to those limited issues. We see no abuse of discretion.

### 2. *Other Evidentiary Challenges*

■ Defendants' other evidentiary challenges include the contention that the trial court should have excluded evidence that their fingerprints were found on some of the diverted money orders and on order forms and envelopes, arguing that the government had failed to establish the chain of custody of these documents. This argument is without merit.

■ Evidence may not be admitted unless it is authenticated in a manner sufficient to support a finding that the proffered document or object is what the proponent of its admission claims it to be. *See* Fed.R.Evid. 901(a). Establishing a chain of custody is but one way of providing such authentication. *See, e.g., United States v. Mendel,* 746 F.2d 155, 166–67 (2d Cir.1984), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). In the present case, there was no dispute as to the facts that the proffered instruments were money orders from the diverted shipments and that the proffered order forms and envelopes had been accompanied by money orders from the diverted shipments; nor was there any dispute that some of the fingerprints on these documents

belonged to the defendants. In the circumstances, the court properly ruled that the fingerprint evidence was sufficiently authenticated to permit its admission into evidence without proof of the documents' chain of custody, and that defendants' arguments went to the weight of the evidence, not its admissibility.

## III. THE CHALLENGES TO THE SENTENCES

Both defendants also challenge their sentences, contending principally that the district court erred in including in their criminal history categories points for their prior convictions for conduct relating to some of the stolen money orders at issue in the present case. Only this contention has merit.

### A. *The Criminal History Calculations*

The presentence report and addendum prepared on Thomas recommended that he be placed in criminal history category ("CHC") II. On the basis of his Kings County conviction for possession in October 1990 of the car purchased from Meteor Motors (the "Meteor conviction"), the court increased his CHC to III.

The presentence report prepared on Reese recommended that he be placed in CHC V because he had four prior convictions: two in Kings County in 1992 for larceny and possession in mid-1990 of property deemed stolen because it had been purchased with stolen money orders (the "larceny convictions"); a third Kings County conviction for possession of stolen credit cards (the "credit-card conviction"); and the previously discussed Virginia conviction for conspiracy to transport stolen money orders. The district court accepted the inclusion of all of these convictions, though it departed downward to Category IV after finding that the larceny convictions were related to each other and concluding that Category V "does not adequately consider some of the links between some of these crimes. It overstates his propensity, so that's why I would take it down to 4." (Sentencing Transcript, November 12, 1993 ("S.Tr."), at 48.)

Defendants contend, and the government concurs, that because Thomas's Meteor conviction and Reese's larceny convictions were for conduct that was part of the instant offense, those convictions were to be considered in connection with the calculation of defendants' offense levels and could not properly be considered in calculating their criminal history. We agree.

A defendant's CHC is calculated on the basis of, *inter alia,* his prior sentences. *See* Guidelines § 4A1.2 Application Note 1. A "prior sentence" for these purposes "means any sentence previously imposed ... for conduct not part of the instant offense." Guidelines § 4A1.2(a)(1). "Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." Guidelines § 4A1.2 Application Note 1. Section 1B1.3 provides that relevant conduct includes "all acts ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." Guidelines § 1B1.3(a)(2).

Thomas and Reese were charged in the present prosecution with, *inter alia,* uttering forged money orders, and conspiring to do so, from April 1990 to May 1991. Thomas's Meteor conviction and Reese's larceny convictions arose out of purchases made between June and October 1990 with some of the forged money orders that were at issue in the present case. These convictions were thus for instances of uttering securities at issue here during the period at issue here. Since these prior convictions encompassed some of the conduct for which Thomas and Reese were convicted in this case, the sentences previously imposed for that conduct could not properly be considered "prior" sentences within the meaning of Guidelines § 4A1.2(a)(1) and should not have been taken into account in calculating their respective CHCs. Accordingly, the sentences in the present case must be vacated, and defendants must be resentenced, with the previously imposed sentences for Thomas's Meteor conviction and Reese's two larceny convictions excluded from the CHC calculations.

Reese also contends that, for like reasons, the sentence for his Virginia convic-

tion for conspiracy to transport stolen securities should not have been considered a prior sentence in the calculation of his CHC. The district court included this conviction in the CHC calculation, stating as follows:

> I find it to be a separate shipment all together [sic]. If it were part of the same scheme I should have counted it all with ... these money orders. I'm not doing that. The Virginia judge was careful not to do that too. And so to that extent I think it's properly dealt with as criminal history.

(S.Tr. at 39.) This finding is troublesome, in part because the use of the term "same scheme" appears to conflate § 1B1.3(a)(2)'s references to "same course of conduct" and "common scheme or plan," which are not identical concepts. *See United States v. Perdomo*, 927 F.2d 111, 114–15 (2d Cir.1991); *United States v. Santiago*, 906 F.2d 867, 872 (2d Cir.1990). Acts may be found to be part of the "same course of conduct" if the defendant engaged in a repeated pattern of similar criminal acts, even if they were not performed pursuant to a single scheme or plan. *See, e.g., United States v. Perdomo*, 927 F.2d at 115 (" 'same course of conduct' concept ... looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be 'connected together' by common participants or by an overall scheme"). A repeated series of similar acts may not properly be characterized as pursuant to a "common scheme or plan," however, unless there is a mental element linking them. *See, e.g., United States v. Chartier*, 970 F.2d 1009, 1016 (2d Cir.1992) (concept of "scheme" or "plan" involves subjective elements). Further, if the mental element is present, the acts need not in fact be similar for the court to find that they were part of the same plan or scheme. *See United States v. Butler*, 970 F.2d 1017, 1025 (2d Cir.) (suggesting that acts of arson and assault in aid of a scheme of extortion against a given victim, though different in kind, could support a finding of common scheme or plan), *cert. denied,* —— U.S. ——, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992).

With respect to Reese, some of the circumstances would have supported a finding that the conduct underlying his Virginia conviction was either pursuant to a common scheme or part of the same course of conduct as that at issue here. The conduct for which Reese was convicted in Virginia, which occurred in September 1991, a few months after the period covered by the present indictment, used the same *modus operandi* as that at issue here. Thus, the Virginia conviction involved a coconspirator telephoning American Express and falsely stating that one of American Express's New Jersey selling agents had changed its address. Further, there was factual overlap, for when Reese and a coconspirator transported to Virginia some of the money orders diverted from the New Jersey selling agent, they also transported several of the Travelers Express money orders that had been diverted from CGM and were at issue in the present prosecution. These facts would have enabled, though perhaps not required, the district court to find that Reese's conduct underlying his Virginia sentence either was pursuant to a scheme that was common to both the New Jersey and New York diversions or was part of the same course of conduct. The district court should revisit these questions on remand.

### B. *Other Sentencing Challenges*

██ Defendants' other sentencing challenges include Reese's contention that the district court should have imposed his sentence in the present case to run concurrently with his state-court sentence for possession of stolen credit cards. We disagree. The Guidelines provide that sentence is to be imposed concurrently with an undischarged term of imprisonment if that term "resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense," Guidelines § 5G1.3(b), and that "[t]his can occur, for example, where a defendant is prosecuted ... for different criminal transactions that were part of the same course of conduct." Guidelines § 5G1.3 Application Note 2. In other circumstances, the district court has discretion to impose a sentence consecutively to the undischarged term of imprisonment to the extent necessary to achieve a reasonable

incremental punishment. *See* Guidelines § 5G1.3(c).

Here, though Reese's two larceny convictions were for conduct that was part of the same course of conduct as the present offense, his credit-card conviction was not. Hence, the district court had discretion to impose sentence for the present offense to be served consecutively to the sentence for the credit-card conviction.

Other sentencing contentions, including Thomas's challenges to the court's refusal to deem him a minor participant in the offenses and to its finding that he was accountable for the entire loss occasioned by the money order diversions because the scope of the conspiracy was reasonably foreseeable to him, are without merit and do not warrant discussion.

### CONCLUSION

We have considered all of defendants' contentions on this appeal and, except to the extent indicated above, have found in them no basis for reversal. Both convictions are affirmed. The sentences are vacated, and the matter is remanded to the district court for resentencing not inconsistent with the foregoing.