RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 04-5101/5261

GEORGE WILLIAM BLOOD (04-5101) and STEPHEN
L. CRITTENDEN (04-5261),

*Defendants-Appellants.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00151—Thomas A. Higgins, District Judge.

Argued: November 1, 2005

Decided and Filed: January 24, 2006

Before: MOORE and SUTTON, Circuit Judges; BUNNING, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David L. Cooper, THE LAW OFFICE OF DAVID L. COOPER, Nashville, Tennessee,
Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellants. Darryl A.
Stewart, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.
**ON BRIEF:** David L. Cooper, THE LAW OFFICE OF DAVID L. COOPER, Nashville,
Tennessee, Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellants.
Darryl A. Stewart, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for
Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. This case presents a question of first impression
for this court: the meaning of the phrase "with intent to deceive another" found in 18 U.S.C.
§ 513(a), which prohibits possession of counterfeit and forged securities with this deceptive intent.
The Defendants-Appellants George Blood and Stephen Crittenden appeal their convictions and
sentences for violation of 18 U.S.C. § 513(a) on a number of grounds. Defendant Blood appeals his

_____

[*] The Honorable David Bunning, United States District Judge for the Eastern District of Kentucky, sitting by
designation.

1

conviction based on insufficiency of the evidence, improper jury instructions, prosecutorial misconduct, judicial bias, and outrageous government conduct, and his sentence in light of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). Defendant Crittenden appeals his conviction based on insufficiency of the evidence and a faulty jury charge, as well as his sentence under *Booker*.

For the reasons set forth below, we **AFFIRM** the convictions on all grounds, **VACATE** the Defendants' sentences, and **REMAND** for resentencing of both Defendants consistent with *Booker*.

## I. BACKGROUND

Defendants George Blood and Stephen Crittenden were two of five defendants named in a two-count indictment filed in the U.S. District Court for the Middle District of Tennessee on September 11, 2002. Count One of the indictment charged that Blood and Crittenden and several others aided and abetted each other in knowingly possessing and affecting commerce with $489,500 in counterfeit and forged securities ("the money orders") purportedly issued by the Travelers Express Company with the intent to deceive another person or organization in violation of 18 U.S.C. § 513(a) and § 2. Count Two of the indictment charged that Blood and Crittenden and others aided and abetted each other in knowingly possessing and affecting commerce with $1,550,000 in counterfeit and forged securities ("the cashier's checks") purportedly issued by the Union Bank of California with the intent to deceive another person or organization in violation of 18 U.S.C. § 513(a) and § 2.

In short, the investment plan in which the Defendants engaged began in June 2002 when Blood and Crittenden met in California with several men, including Vinnie Pham and Tah Kir "Tosh" Khraishi, who offered to sell them the money orders (purportedly issued by the Travelers Express Company, Inc.) and the cashier's checks (purportedly issued by the Union Bank of California) for less than their face value. Blood and Crittenden agreed to buy the securities. Shortly thereafter, Crittenden contacted an acquaintance, Jesse Phipps, to see if he wanted to participate in the transaction. After agreeing to make the investment, in June of 2002, Phipps contacted Lyle Smith to inquire into the propriety of the program and ways to improve the yield. Smith operated an "international recovery company" specializing in recovering investors' funds from off-shore investments that have been misplaced or misappropriated. After several conversations between Phipps and Smith, Phipps faxed Smith a copy of a money order to see if Smith was interested in making a purchase. Smith contacted Travelers Express, which notified Smith that the money order might be counterfeit. Smith then alerted the FBI to these fraudulent securities, reporting that there were approximately ten million dollars in fraudulent securities being transported, and the FBI decided to pursue the case, making Smith an FBI confidential informant.

Thereafter, Smith developed an investment program to bring Defendants from California to Nashville. Essentially, Smith proposed taking the counterfeit securities to a Nashville Bank for transmission to Cyprus[1] for "hypothecation," which Crittenden's attorney described as "the trade practice for high yield investments of compounding the principal amount of the collateral at a rate of 100% interest per year." Crittenden Br. at 9-10. Smith shared his plan with Phipps, who discussed it with Crittenden, and Crittenden agreed to participate.

On July 2, 2002 Phipps, Crittenden, and Richard Neuman, who was hired by Crittenden to provide security, brought $200,000 worth of counterfeit money orders to Nashville and gave them to Smith. Smith testified that Phipps and Crittenden wanted Smith to give back the money orders or pay them $50,000. Smith instead kept the money orders without paying for them and turned them

---

[1]Although the transcript of the proceedings in this case refers to "Cypress," it appears that Smith and other witnesses were referring to the country of Cyprus, a Mediterranean island nation about fifty miles south of Turkey.

over to the FBI. Smith testified that he told Phipps and Crittenden at this meeting that the money orders were counterfeit. The following day, Smith tape recorded a conversation he had with Blood and Crittenden, both of whom wanted Smith to return the money orders he had received the day before. Smith testified that during this conversation he made clear that the money orders were counterfeit. Phipps also testified that, through his conversations with Blood and Crittenden, he was aware that they knew that the money orders and cashier's checks were fraudulent.

On August 13, 2002, Blood, Crittenden, Neuman, and Phipps returned to Nashville, bringing $300,000 worth of money orders and $1,500,000 worth of cashier's checks to Smith. Neuman testified that he saw Blood wipe his fingerprints off the fraudulent securities. Phipps and Neuman met Smith for the exchange and were arrested by the FBI. They immediately agreed to cooperate with the FBI to arrest Blood and Crittenden, and the FBI then arrested the Defendants.

A representative from the Union Bank of California, the entity that purportedly issued the counterfeit cashier's checks, testified that her institution would not have honored the cashier's checks because of their glaring deficiencies. A representative from Travelers Express, the entity that purportedly issued the forged money orders, similarly testified that if the money orders had been presented for payment, they would have been returned unpaid, both because they were subject to a stop payment and because they were obviously forged.

Blood and Crittenden were tried by a jury and, on July 2, 2003, were found guilty on both counts of the indictment. The Defendants then filed a motion for judgment of acquittal, or, in the alternative, for a new trial; these motions were denied. In early 2004, Blood and Crittenden were sentenced, Blood to a term of sixty months followed by three years of supervised release and Crittenden to a term of seventy-eight months followed by three years of supervised release. They now challenge the judgments as well as the sentences imposed by the district court.

## II. ANALYSIS

### A. Insufficiency of the Evidence

"'This court will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole . . . .'" *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002) (quoting *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992)). We must uphold a jury verdict if "'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Defendants' first challenge to the sufficiency of the evidence is based on their claim that the district court erred in its interpretation of 18 U.S.C. § 513(a). We review de novo a district court's statutory construction. *United States v. Morgan*, 216 F.3d 557, 561-62 (6th Cir. 2000). The provision under which the Defendants were convicted reads:

> Whoever makes, utters or possesses a counterfeited security of a State or political subdivision thereof or of an organization, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than 10 years, or both.

18 U.S.C. § 513(a). The gravamen of Defendants' insufficiency of the evidence claim is their contention that "with intent to deceive another person, organization, or government" means an intent to deceive an entity other than the one that purportedly issued the counterfeit or forged securities. Defendants argue that because the Government offered proof only of their intent to deceive Union

Bank of California and Travelers Express Company, the purported issuers of the securities, Defendants were not found guilty of the requisite intent, and thus there was not sufficient evidence to convict them. The contours of § 513(a)'s intent-to-deceive requirement is a question of first impression for this court. We conclude that Defendants' argument fails, however, because their reading of § 513(a) is undermined by the language of the statute and finds no support in the policies underlying the statute or any decisional authority.

Defendants read the word "another" distributively — i.e., as modifying each entity that follows: "person," "organization," and "government" — so that the statute requires that the intention to deceive be directed towards "another" entity aside from the issuing entity. Defendants' reliance on *United States v. Thomas*, 54 F.3d 73 (2d Cir. 1995), to support their reading of the statute is misplaced. Although *Thomas*, the only court of appeals decision to address this issue, sheds some doubt on the Government's view of § 513(a)'s intent-to-deceive requirement, which would include an intent to deceive a security's purported issuer, the opinion ultimately rejects the narrow reading that Defendants propose. *Id.* at 80. In *Thomas*, the Second Circuit found that "the adjective 'another' [in § 513(a)] was intended to be commutative [sic], applying not only to 'person' but to 'organization' and 'government' as well, since the last two nouns are unaccompanied by any article modifier of their own" and otherwise the resulting reading — with intent to deceive organization or government — would be awkward and thus likely "not what Congress intended." *Id.* at 79. The Second Circuit studied the legislative history, which revealed that § 513(a) is the only provision in Chapter 25 of Title 18 that refers to an intent to deceive "another" entity as opposed to a mere "intent to defraud." *Id.* at 79-80. Finding no explanation for this divergence, the court concluded that the legislative history was inconclusive on the issue. *Id.* at 80. *Thomas* then held that because Congress's amendments to Chapter 25, including the addition of § 513, were meant to close gaps, there was no reason why Congress would have placed attempts to deceive the issuer of securities outside of § 513(a)'s reach, and thus declined to accept that § 513(a) did not cover an intent to deceive the security's issuer. *Id.*

While we ultimately agree that § 513(a)'s intent requirement includes deception aimed at the security's purported issuer, we reach this conclusion along somewhat different lines. Rather than reading "another person, organization, or government" to contrast with the issuing entity, we hold that this clause should be read in contrast with "whoever," that is, the party charged with violating the statute. The statute thus only requires that the entity towards which the deceptive intent is directed be different from the entity engaging in the deception. This reading avoids the awkwardness of not interpreting "another" in a distributive way, as well as the problematic construction that results from reading "another" to contrast with the issuing entity, and still upholds the gap-closing policy underlying the statute.

Other sections of Chapter 25, the chapter addressing counterfeiting in which § 513 is found, use the phrase "with intent to defraud" as opposed to "with intent to deceive." *See Thomas*, 54 F.3d at 79. Most of the sections in this chapter do not identify the target of the fraudulent intent. *Id.* Those that do, however, either denote the target in very specific terms, *see* 18 U.S.C. § 495 ("with intent to defraud the United States"), in an entirely general manner, *see id.* § 485 ("with intent to defraud any body politic or corporate, or any person"); *id.* § 490 ("with intent to defraud any person"), or some combination of the two, *see id.* § 500 ("with intent to defraud the United States, the Postal Service, or any person). No other section in this chapter refers to the target of the deceptive intent as "another" entity. *See Thomas*, 54 F.3d at 80.

The legislative history does not explain why different language was used in this section. Although § 513 and what is now 18 U.S.C. § 510 were enacted at different times, *see* Pub. L. No. 98-151, § 115(a), 97 Stat. 964, 976 (1983) (codified at 18 U.S.C. § 510); Pub. L. No. 98-473, tit. II, § 1105(a), 98 Stat. 1837, 2144 (1984) (codified at 18 U.S.C. § 513), both sections were initially encompassed in the same bill, S. 1762, 98th Cong. tit. XI, pt. D (1983), and were discussed in the

same report of the Senate Judiciary Committee. *See* S. Rep. No. 98-225, at 372 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3513. This Report sets forth the language of both of these sections, and although § 510 uses "with intent to defraud" language without specifying the target of the fraud, whereas § 513 uses "with intent to deceive" language and limits the target of this intent to "another person, organization, or government," the Report does not address these differences. *See Thomas*, 54 F.3d at 80 (citing S. Rep. No. 98-225 at 371-72). About current § 513, the Committee simply stated that a new offense was needed to criminalize the counterfeiting of securities of state and local governments or of corporations because the practice is "widespread and has a serious detrimental effect on interstate commerce." S. Rep. No. 98-225, at 371. There is nothing in the report to suggest that the deceptive intent must be aimed at an entity other than the issuing body, and the Defendants advance no justification for why Congress would exempt from § 513 deceptive intent aimed at the purported issuing entity. As the Second Circuit emphasized, the remedial, gap-closing focus of § 513 indicates that such deceptive intent was meant to be captured by § 513. *See Thomas*, 54 F.3d at 80.

The phrase "with intent to deceive another" cannot be found anywhere else in the United States Code. A similar phrase appearing in Title 10, which covers the armed forces, further supports our reading of § 513(a). Section 921(a) of that title, which governs larceny and wrongful appropriation, states:

> Any person subject to this chapter who wrongfully takes, obtains, or withholds, by any means, from the possession of the owner or of any other person any money, personal property, or article of value of any kind--
> (1) *with intent permanently to deprive or defraud another person* of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, steals that property and is guilty of larceny; or
> (2) *with intent temporarily to deprive or defraud another person* of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, is guilty of wrongful appropriation.

10 U.S.C. § 921(a) (emphasis added). "Another person" contrasts with "any person" that begins the section, which, like "whoever" in § 513(a), is anyone subject to prosecution under the law. Although "another person" towards whom the fraudulent intent is aimed could be read to contrast with the intervening phrase "owner or of any other person [from whom property is taken]," common sense and case law dictate that "another person" merely means a person other than the one doing the taking, but includes anyone from whom property has been taken. *Cf. United States v. Pacheco*, 56 M.J. 1, 3 (C.A.A.F. 2001) (holding, where property was taken from its owner, that the "intent to permanently deprive the *owner* of the use and benefit of the weapon" meets 10 U.S.C. § 921(a)'s intent requirement) (emphasis added). Thus, the use of the phrase "another person" simply forecloses the possibility of committing larceny against oneself. *Id.* Likewise, the use of "another" in § 513(a) is simply used to distinguish the entity towards whom the deceptive intent is directed from the entity who is acting with the intent to deceive, thereby excepting self-deception from the statute's coverage, but not deceptive intent aimed at a purported issuing entity.[2]

Read in the context of the rest of the United States Code, which frequently uses "another" in juxtaposition with "whoever," this interpretation is the natural and common reading of "another" in a criminal statute. *See, e.g.*, 15 U.S.C. § 80a-36 ("[w]hoever steals . . . , converts to his own use or to the use of another . . .); 18 U.S.C. § 641 ("[w]hoever embezzles, steals, purloins or knowingly converts to his use or the use of another . . ."); 18 U.S.C. § 645(c) ("[w]hoever, with intent to

---

[2]Although the Second Circuit was "skeptical" that the word "another" was simply meant to exclude the charged party's own self-deception from coverage, the court provided no explanation for its skepticism. *Thomas*, 54 F.3d at 79.

defraud, knowingly . . . converts to his own use or to that of another. . . . ”); 18 U.S.C. § 654 (“[w]hoever, being an officer or employee of the United States or of any department or agency thereof, embezzles or wrongfully converts to his own use the money or property of another. . . . ”); 18 U.S.C. § 661 (“[w]hoever . . . takes and carries away, with intent to steal or purloin, any personal property of another. . . . ”); 18 U.S.C. § 875(c) (“[w]hoever transmits . . . any communication containing any threat to kidnap any person or any threat to injure the person of another. . . . ”); 18 U.S.C. 1028A(a) (“[w]hoever . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person”); 18 U.S.C. § 1203 (“whoever . . . seizes or detains and threatens to kill, to injure, or to continue to detain another person. . . .”); 18 U.S.C. § 1513(a)(1) (“[w]hoever kills or attempts to kill another person. . . .”).  Indeed, another section within Chapter 25 also uses “another” this way.  *See* 18 U.S.C. § 500 (“[w]hoever embezzles, steals, or knowingly converts to his own use or to the use of another . . .”); *id.* (“[w]hoever receives or possesses any such money order form with the intent to convert it to his own use or gain or use or gain of another. . . .”).

This reading of “another” does raise one question.  Contrasting “another” with “whoever” assumes that those entities that follow “another,” namely persons, organizations, and governments, could each constitute “whoever,” that is, an entity capable of being charged with violating § 513(a). It is clear that persons are subject to prosecution under § 513(a), and organizations would also likely be subject to criminal liability for violating § 513.[3]  However, governments are not currently subject to the provisions of the criminal law.  *See* Stuart P. Green, *The Criminal Prosecution of Local Governments*, 72 N.C. L. Rev. 1197, 1245 (1994) (explaining that although municipal governments had been subject to criminal prosecution in the nineteenth and early twentieth centuries, such prosecutions have ceased).

Despite this, contrasting “another” with “whoever” remains the most sound reading of the statute.  There is nothing in either the text of the section or the policies underlying it to indicate that Congress intended to exclude from prosecution under § 513(a) those whose deceitful intent was aimed at the security’s purported issuer.  This reading is the most natural given the high frequency with which Congress uses “another” in this manner.  It best effectuates the Congressional intent to criminalize “widespread” and “seriously detrimental” fraudulent schemes, like the one here, that involve the counterfeiting of securities issued by state and local governments or by corporations. S. Rep. No. 98-225 at 371.

Moreover, following the Defendants’ interpretation of § 513(a) would not avoid this problem.  When the Defendants’ distributive view of “another” is applied to “person,” a similar interpretive glitch arises.  Because the statute describes the issuers of securities as either “a State or political subdivision thereof” or an “organization,” reading the statute to require the deceptive intent to be aimed at a “person” aside from the issuing entity does not square with the rest of the section, as “person[s]” are not relevant issuing entities under the statute.

---

[3]The statute defines “organization” as “a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, society, union, or any other association of persons which operates in or the activities of which affect interstate or foreign commerce.”  18 U.S.C. § 513(c)(4).  Organizations encompassed within this definition can be subject to criminal liability for the violation of a federal statute.  *See, e.g.,United States v. A & P Trucking Co.*, 358 U.S. 121, 126 (1958) (partnership); *New York Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 491-95 (1909) (corporation); *United States v. Carter*, 311 F.2d 934, 941-42 (6th Cir. 1963) (corporation).

We therefore hold that § 513(a)'s "with intent to deceive another" requirement encompasses the intent to deceive the purported issuers of the fraudulent securities in question. With this understanding of § 513(a), there was sufficient evidence to support the jury's verdict.[4]

Defendant Blood also alleges that there was insufficient evidence to support his conviction under § 513(a) because the government failed to prove his "intent to defraud" by showing that he passed or attempted to pass the counterfeit securities. Blood's argument is legally faulty. Blood's argument that conviction under § 513(a) requires that the defendant passed or attempted to pass the counterfeit security is misplaced because the cases he cites to support this argument refer not to a conviction for possession of counterfeit securities under § 513(a), but for the delivery of counterfeit money under 18 U.S.C. § 473, *see United States v. Crachy*, 800 F.2d 83, 87 (6th Cir. 1986), or the uttering of counterfeit securities under 18 U.S.C. § 472, *United States v. Wethington*, 141 F.3d 284, 287 (6th Cir. 1998). First, these sections require an "intent to defraud," whereas § 513(a) requires only an "intent to deceive." These requirements are not synonymous: "'[d]eceive is to cause to believe the false or to mislead,'" whereas "'[d]efraud is to deprive of some right, interest or property by deceit.'" *United States v. Yermian*, 468 U.S. 63, 73 n.12 (1984) (quoting *United States v. Godwin*, 566 F.2d 975, 976 (5th Cir. 1978)). Therefore, the intent to deceive does not necessarily include an intent to cause a loss. *See Sui v. INS*, 250 F.3d 105, 118 n.12 (2d Cir. 2001). Second, unlike § 513(a), 18 U.S.C. § 473 explicitly requires a showing of "intent that the [false security] be passed, published, or used as true and genuine. . . ." Because of these differences in text between these sections and § 513(a), Blood's conviction required only proof of mere possession of counterfeit or forged securities "with intent to deceive another," not proof that Blood passed or attempted to pass counterfeit securities with an intent to defraud.

The evidence introduced against Blood, if believed, showed that on August 13, 2002, he had, along with Crittenden, Neuman, and Phipps, $300,000 worth of money orders and $1,500,000 worth of cashier's checks in his possession, that he knew these securities were counterfeit, and that he was engaged in a plan to rely on these counterfeit securities to serve as collateral, and that this plan involved deceptive intent, at least towards Travelers Express Company, Inc. and Union Bank of California, the purported issuers of the securities. This evidence is sufficient for a reasonable jury to have found Blood guilty of violating § 513(a).

Finally, Defendant Blood alleges that there was insufficient evidence to convict him of aiding and abetting in violation of 18 U.S.C. § 2. "[T]o aid or abet another to commit a crime, a defendant must in some way associate himself with the venture such that his participation is intended to bring about the crime or make it succeed." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991). "The government must prove that the aider/abettor had the same mental state as that necessary to convict a principal of the offense." *United States v. Searan*, 259 F.3d 434, 444 (6th Cir. 2001) (citing *United States v. Loder*, 23 F.3d 586, 591 (1st Cir. 1994)). Blood provides no explanation as to what proof the government failed to provide that causes his aiding and abetting conviction to be unsupported. As the government offered evidence that Blood was one of the primary participants in planning and carrying out the fraudulent investment scheme here, and that

_____

[4] At the close of evidence, each Defendant moved under Rule 29 for judgment of acquittal due to insufficient evidence as to both counts of the indictment on the same grounds as its insufficiency of the evidence argument — namely, that to establish a violation of § 513(a), the entity at which the deceptive intent was aimed and the purported issuing entity must be two separate entities — and the district court denied these motions. We review this decision under the same standard as an insufficient evidence claim, *United States v. Bowker*, 372 F.3d 365, 387-88 (6th Cir. 2004), and thus we hold that the district court did not abuse its discretion in denying judgments of acquittal for the reasons set forth above supporting the broader reading of § 513(a)'s intent requirement.

Defendant Blood also claims that the government's proof at trial constituted either an amendment of the indictment or a material variance to the indictment. As this issue was not raised below, and Blood has only raised it in a footnote in his brief on appeal without explanation, we decline to review it.

he had an intent to deceive at least the purported issuing entities, we hold that there was sufficient evidence to support his conviction on this charge.

## B.  Improper Jury Instructions

We review a properly preserved objection to a jury instruction by determining "'whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.'" *United States v. Pensyl*, 387 F.3d 456, 458 (6th Cir. 2004) (quoting *United States v. Zidell*, 323 F.3d 412, 427 (6th Cir. 2003)).  We will reverse a judgment where the jury instruction "'fails accurately to reflect the law.'"  *Id.* (quoting *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999)).  In addition, we may reverse the trial court based on a faulty charge "'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'"  *Id.* (quoting *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999)).  Although a jury instruction alleged to be faulty on a question of law is reviewed de novo, the failure to provide a requested jury instruction, as a matter within the trial court's discretion, is reviewed for abuse of discretion. *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365-66 (6th Cir. 2005).  Harmless errors are disregarded.  Fed. R. Crim. P. 52(a).

A district court must charge the jury with an instruction on the defendant's theory of the case "if the theory has some support in the evidence and the law," but not where the instruction is "based on speculation."  *Morgan*, 216 F.3d at 566.  "When reviewing a district court's decision not to give a jury instruction, the reviewing court must reverse only if it finds that the proposed instruction is correct, is not substantially covered by the charge, and is so important that failure to give it substantially impairs the defense."  *Id.* at 566-67.

Defendants' claim that the district court erred in its jury instruction regarding the scope of § 513(a) is grounded in the same theory as their insufficiency of the evidence claim:  the instruction allowed the jury to convict them on the basis of deceitful intent towards the securities' purported issuers rather than a separate entity.  Defendants requested that the district court instruct the jury that to be found guilty under § 513(a), the jury had to find that their intent to deceive was aimed at an entity separate from those who purportedly issued the securities, and the district judge rejected this request.[5]  The district court instead provided the following instruction:

> If you are convinced beyond a reasonable doubt that the first and second elements of counts one and two under Title 18, United States Code, Section 513(a), are satisfied, that is, that the defendants knowingly possessed counterfeit and/or forged certificates — securities of an organization in or affecting interstate commerce — then you must decide whether the government has proved beyond a reasonable doubt that the defendants intended to deceive another person or organization.

Joint Appendix ("J.A.") at 710 (Trial Tr. at 583).

Based on our conclusion that § 513(a) does not require that the "intent to deceive" be aimed at an entity separate from the issuing entity, the district court's instruction correctly stated the law. Accordingly, we reject the Defendants' claim of an improper jury instruction.

Blood also claims that the entrapment-by-estoppel instruction given by the district court was improper because it grafted on to entrapment by estoppel some elements of general entrapment and required Blood to prove elements of general entrapment on his defense of entrapment by estoppel. The district court instructed the jury that the Defendants would be entitled to the defense of entrapment by estoppel if:  "One, the government, or through its informant, announced that the

---

[5]Although Blood never specifically objected to this instruction, whether he preserved the objection is immaterial because the instruction was not erroneous.

charged criminal conduct was legal.  Two, the defendants relied upon the government's or its informant's announcement.  Three, the defendants' reliance was reasonable.  And four, given the defendants' reliance the government's [prosecution] for the charged crime is unfair."  J.A. at 717 (Trial Tr. at 590).  After discussing each of these elements, and without clearly transitioning to a separate defense of entrapment (which, in any event, the Defendants did not request), the district judge began giving instructions related to an entrapment defense:

> It is sometimes necessary during an investigation for a government agent to pretend to be a criminal and to offer to take part in a crime. . . . This is permissible. . . . The crucial question in a case in which entrapment is asserted as a defense is whether the government persuaded a defendant who was not already had [sic] to commit a crime to go ahead and commit it.  The government has the burden of proving beyond a reasonable doubt that the defendants were already willing to commit the offenses under consideration.

J.A. at 719 (Trial Tr. at 592).  The judge then went on to explain how a defendant's state of mind is proved.  Defendant Blood claims that the district court erred in instructing the jury in this way because it risked confusing the jury.

We must consider whether Blood adequately preserved this objection for review.  Federal Rule of Criminal Procedure 30 requires that "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate."  Fed. R. Crim. P. 30(d).  If no objection is made, or the objection is not sufficiently specific, we review the claimed defect in the instruction only for plain error.  *See* Fed. R. Crim. P. 52(b); *United States v. Reese*, 568 F.2d 1246, 1251 (6th Cir. 1977).

After the evidence was presented and prior to the jury charge, the district court held a charge conference, during which Crittenden's attorney, Peter J. Strianse, made several objections to the proposed instructions, including a specific objection to the proposed entrapment-by-estoppel instruction on the ground that it confused this defense with general entrapment.[6]  Following this, Blood's attorney, David L. Cooper, made a general request to apply all of Strianse's objections to Blood.  The court responded by informing Cooper that his request was "imprecise," and that the judge was "putting [Cooper] on notice [that] to preserve [his] position, [he] must make [his] precise objections after the instructions have been delivered to the jury" because "[t]he Court of Appeals has a right to insist that you spell out . . . immediately after the delivery of the instructions what your objections are."  J.A. at 785-86 (Charge Conf. Tr. at 56-57).  The judge then reiterated what he was requiring of Cooper to preserve Blood's objections, and Cooper responded "right."  J.A. at 786 (Charge Conf. Tr. at 57).  After the jury was charged, the court asked whether Blood had any objections to the instructions, and Cooper raised several points, but made no objection to the entrapment-by-estoppel instruction.  The court then asked for Crittenden's objections, and Strianse renewed his objection to the entrapment-by-estoppel instruction.  Cooper made no general objection incorporating Strianse's objections.

Whether a defendant's objection at a charge conference is sufficient to preserve the objection when it is renewed later only by a co-defendant is a question of first impression for this court.  We have held that where a co-defendant makes a valid objection to an instruction, and defendant's counsel objects generally, stating "'I incorporate all the objections made by other defense counsel,'" this constitutes a validly preserved objection.  *United States v. Pincione*, 565 F.2d 404, 405 (6th Cir. 1977).  Although other courts have held that specific objections made during a pre-charge

---

[6]Crittenden does not raise this issue on appeal.

conference that are incorporated by reference in a general post-charge objection are preserved for review, preservation of the objection required post-charge general incorporation. *See United States v. Hollinger*, 553 F.2d 535, 542-43 (7th Cir. 1977); *Las Vegas Merch. Plumbers Ass'n v. United States*, 210 F.2d 732, 744 (9th Cir. 1954). Given the district judge's warning that Blood must renew his objections more specifically after the jury charge was given, and Blood's failure to renew even his general objection, Blood's general objection made during the charge conference failed to incorporate Crittenden's objection to preserve it for Blood on appeal.

Although trial judges do not have unfettered discretion in determining what they will require to preserve objections, "if the trial judges . . . prefer to do so they are empowered to require the voicing of objections after the charge is given." *Hollinger*, 553 F.2d at 542. The district judge's request here was reasonable: requiring specificity in making objections allows for clarity to ensure that the district court may correct any errors and that the record is entirely clear on what matters the party is preserving for review. The judge also gave Cooper reasonable notice of what was required to preserve the objection, and after the jury was charged, the judge asked whether Blood had objections. Despite this, not only did Blood fail to provide a specific objection to the entrapment-by-estoppel instruction after the charge, but he also failed to make even a general objection incorporating Crittenden's objections. Because Blood did not preserve this objection, we will review it only for plain error. *See* Fed. R. Crim. P. 52(b); *See Reese*, 568 F.2d at 1251.

The entrapment-by-estoppel defense "'rests on a due process theory . . . focus[ing] on the conduct of the government officials rather than on a defendant's state of mind.'" *See United States v. Batterjee*, 361 F.3d 1210, 1218 (9th Cir. 2004) (quoting *United States v. Brebner*, 951 F.2d 1017, 1025 (9th Cir. 1991)); *see also Cox v. Louisiana,* 379 U.S. 559, 571 (1965); *United States v. Levin*, 973 F.2d 463, 468 (6th Cir. 1992). Whereas one of the elements of an entrapment defense is "'the absence of predisposition on the part of the defendant,' *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994), a defendant's pre-disposition to commit an offense is not at issue in an entrapment by estoppel defense." *Batterjee*, 361 F.3d at 1218 (collecting cases). Given this distinction between the theories of these two defenses, the district court's muddling of the elements of entrapment and entrapment by estoppel could have made the charge viewed as a whole "confusing, misleading, or prejudicial," *Pensyl*, 387 F.3d at 458, as it could have erroneously led the jurors to believe that the defense of entrapment by estoppel required the Defendants to present evidence that they were not predisposed to commit the crime in question.

Even if the claim had been validly preserved, however, we would not upset the conviction on this basis because the error was of no consequence. The entrapment-by-estoppel defense is available when: "(1) a government . . . announced that the charged criminal act was legal; (2) the defendant relied on the government announcement; (3) the defendant's reliance was reasonable; and, (4) given the defendant's reliance, the prosecution would be unfair." *Levin*, 973 F.2d at 468. The Defendants presented no evidence that Smith or any other government actor told Blood or Crittenden that the scheme in which they were participating was legal. At most, Smith stated that the bank in Cyprus was legitimate and that the investment plan that he was advocating had worked before. Moreover, the Defendants' reliance could not be considered reasonable because at the time of the reliance, the Defendants did not know that Smith was a government agent and thus they could not have reasonably relied on his statements of the law.[7] Further, given the evidence offered by the Government that the Defendants knew that the securities were counterfeit, it would not have been

---

[7]We note that Smith, an FBI informant, might not have been an "authorized government official" capable of making an announcement of law for purposes of the entrapment-by-estoppel defense, particularly because the Defendants did not know that he was a government agent at the time they claim to have relied on his alleged announcements. *See Tinsley v. United States*, No. 95-5564, 1997 WL 63156, at *5 (6th Cir. Feb. 12, 1997) (citing *United States v. Collins*, 61 F.3d 1379, 1385 (9th Cir. 1995)).

reasonable for them to conclude that their conduct was legal.  Because the error was harmless, we deny Blood's claim.

## C.  Prosecutorial Misconduct

Defendant Blood alleges prosecutorial misconduct.  Blood claims that the Government did not inform him prior to Smith's testimony that Smith had assisted and testified for the FBI in several other fraud cases, which Blood argues is a due process violation under *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), because it could have served to impeach Smith.

Because Blood did not raise this issue below, we review this claim for plain error.  *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004).  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *Brady* also applies to the nondisclosure of evidence affecting the credibility of a witness whose "reliability . . . may . . . be determinative of guilt or innocence."  *Giglio v. United States*, 405 U.S. 150, 153-54 (1972) (quotation omitted); *see also United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005).  However, we have held that "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose" and that a "[d]elay only violates *Brady* when the delay itself causes prejudice." *See United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994).  Because testimony regarding Smith's previous experience assisting the FBI was elicited from Smith at trial and the delay in disclosure did not result in prejudice, we hold that there was no *Giglio* violation here.

Blood also claims that the Government's failure to produce the print-out of the National Crime Information Center ("NCIC") inquiry into Smith's criminal history amounts to prosecutorial misconduct.  After the Government disclosed that Smith had no criminal history, Strianse, Crittenden's counsel, requested the NCIC documentation from the prosecution during trial, and the district judge did not compel its production.

We review the denial of a motion to compel production, as an evidentiary matter within the trial court's discretion, for an abuse of discretion.[8]  *Ventura v. Cincinnati Enquirer*, 396 F.3d 784, 789 (6th Cir. 2005).  Although it was Crittenden and not Blood who raised this issue below,[9] we need not decide whether this sufficed to preserve the issue for review as to Blood because the district court did not abuse its discretion in deciding not to compel the Government to produce the NCIC documentation.  The Government is only required to disclose its informant's criminal history if he has one.  Moreover, *Brady* and *Giglio* only require "'that the government turn over evidence in its possession to the defense that is both favorable to the accused and material to guilt or punishment.'" *Jones*, 399 F.3d at 647 (quoting *Hicks v. Collins*, 384 F.3d 204, 220 (6th Cir. 2004)).  As Blood has made no showing that the NCIC documentation requested would undermine Smith's credibility or would have a chance of changing the outcome of the trial, there has been no *Giglio* violation.

Blood also claims that the prosecutor engaged in misconduct by eliciting false testimony from several witnesses.  Where contemporaneous objections are made at the time of testimony, we review claims of prosecutorial misconduct in violation of due process for harmless error.  *United States v. Leon*, 534 F.2d 667, 682 (6th Cir. 1976).  Where no objections are made, we review such claims for plain error.  *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994).

---

[8]Although the request was not formally styled as a motion to compel, we will treat it as such because that was the substance of the request.

[9]Only Blood raises this issue on appeal.

In considering whether a prosecutor's inappropriate statements warrant reversal, we first "'determine whether a prosecutor's remarks were improper, and then we determine whether the impropriety amounts to reversible error.'"  *United States v. DeJohn*, 368 F.3d 533, 548 (6th Cir. 2004) (quoting *Carroll*, 26 F.3d at 1385).  "In determining whether reversal is necessary, we look to four factors:  '(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.'"  *Id.* (quoting *Carroll*, 26 F.3d at 1385).  Blood cites several instances, only some of which were raised below, where the prosecutor purportedly elicited false testimony.  Because the prosecutor's comments were not improper, Blood's claims fail under either standard.

Blood contends that the prosecutor elicited false testimony from Smith regarding Smith telling the Defendants and others about the securities being deposited in a Nashville bank.  There is nothing in the record to show that this testimony is false.  Although one of the taped conversations indicates that Smith told Phipps that the securities would not be deposited, Smith testified that this was just one instance, and that he had over the course of his contact with the Defendants made clear to them that these securities were to be deposited in the Nashville Bank.  Because the prosecutor did not appear to be eliciting false testimony, and there was nothing misleading or prejudicial about the question or response, this did not constitute misconduct.

Blood further complains that the prosecutor's question to Smith regarding people generally not "knowingly tak[ing] worthless counterfeit money orders as collateral," J.A. at 421 (Trial Tr. at 267), constituted misconduct because, according to Blood, Smith had led the Defendants to believe that the program was legitimate.  This question was not improper because whether Smith, who worked in the investment field, "kn[e]w anybody that would . . . knowingly take worthless counterfeit money orders as collateral," *id.*, goes directly to two issues relevant at trial:  (1) whether Defendants possessed the requisite "intent to deceive" for conviction under § 513(a), and (2) whether any reliance that Defendants might have had on Smith's statements was reasonable for the entrapment-by-estoppel defense.

Finally, Blood's complaint regarding the Government's question of Khraishi to which he responded that he "assume[d]" that the Defendants knew the money orders were stolen, J.A. at 446 (Trial Tr. at 292), lacks merit.  The prosecutor asked if Mr. Khraishi "kn[e]w" whether the Defendants "knew [the money orders] were stolen."  *Id.*  Mr. Khraishi responded based on his assumption.  If Blood finds problematic the lack of personal knowledge on which the response was based, he could have objected to this answer, but he failed to do so.  There is nothing to indicate that the prosecutor intended to elicit false testimony or testimony based on assumption.  Therefore, as the Government's questions were not improper, reversal is not warranted.

## D.  Judicial Misconduct

Blood claims that the district judge exhibited judicial bias that denied him the right to a fair trial under the Sixth Amendment.  U.S. Const. amend. VI.  Because Defendant Blood raises this claim for the first time on appeal, we review it for plain error.  *United States v. Owens*, 159 F.3d 221, 227 (6th Cir. 1998).

To support his claim, Blood cites seven incidents of supposed judicial bias.  Three of these instances were questions that the district judge asked witnesses during trial.  Judicial misconduct is found where the judge's remarks "'clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties[,]'" *Rocha v. Great Am. Ins. Co.*, 850 F.2d 1095, 1100 (6th Cir. 1988) (quoting *Knapp v. Kinsey*, 232 F.2d 458, 466 (6th Cir. 1956)), or where the judge, in exercising his discretion to interrogate witnesses, "'abandons his proper role and assumes [the role] of [an] advocate,'" *id.*

(quoting Fed. R. Evid. 614(b), advisory committee note). Although the judge's inquiries exhibited sarcasm and could have been phrased more diplomatically, they primarily evidence the judge's effort to seek additional information from witnesses and not any prejudice or bias against Blood, and thus Blood has failed to show that they amount to misconduct.

Blood also claims that a sarcastic comment made by the trial judge interfered with his case. However, this comment was made out of the presence of the jury, which neutralizes whatever inappropriateness it may have contained, and Blood has failed to meet the "high hurdle" required to prove bias from remarks made in the absence of the jury. *See United States v. Morrow*, 977 F.2d 222, 225 (6th Cir. 1992) (en banc).

The final three instances of misconduct cited by Blood relate to evidentiary rulings. In one of the instances that Blood cites, the trial judge allowed Crittenden's counsel to continue his questioning after an objection. The two other rulings, far from exhibiting bias, merely represent the district judge's function in determining the admissibility of evidence. Without additional evidence, two unfavorable evidentiary rulings will not sustain a claim for judicial bias.

### E.  Outrageous Government Conduct

Blood claims that Smith's involvement with the Defendants' investment scheme constitutes outrageous government conduct. Although the availability of this defense is a question of law that we review de novo, *United States v. Warwick*, 167 F.3d 965, 974 (6th Cir. 1999), where, as here, this defense was not raised below, we review the trial court's failure to instruct on it for plain error, *see* Fed. Rule Crim. P. 52(b). To establish outrageous government conduct, a defendant must show that "the government's involvement in creating his crime (*i.e.*, the means and degrees of inducement) was so great 'that a criminal prosecution for the [crime] violates the fundamental principles of due process.'" *Warwick*, 167 F.3d 974 (quoting *United States v. Russell*, 411 U.S. 423, 430 (1973)). We have held that the outrageous government conduct defense is not available where the defense is based either on a theory of government inducement, *id.* at 975 (citing *United States v. Tucker*, 28 F.3d 1420, 1422 (6th Cir. 1994)), or on a theory that the "undercover officer's involvement in creating [the] crime was so significant that criminal prosecution violates due process," *id.* (citing *United States v. Mack*, 53 F.3d 126 (6th Cir. 1995)).

The conduct of Smith that Blood claims to be outrageous includes soliciting a recovery fee from the Travelers Company, coming up with the investment plan and a way to get the Defendants to Nashville, and leading the case against the Defendants without sufficient FBI supervision. Even taken as true, these allegations cannot support a claim for outrageous government conduct because Blood's claim is based in either one or both of the following theories: (1) that Smith's conduct induced him to commit the crime, and (2) that Smith's involvement was "so significant that criminal prosecution violates due process." *Id.* Because the defense is not available under either of these theories, it was not error, let alone plain error, for the district court not to provide an outrageous-government-conduct instruction.

### F.  Improper Sentencing

As the sentences of both Defendants were pending on direct appeal when *Booker*, 543 U.S. 220, 125 S. Ct. 738, was issued and neither one raised a Sixth Amendment challenge before the district court, we review the sentences to determine whether there has been a Sixth Amendment violation under *Booker* for plain error. *United States v. Oliver*, 397 F.3d 369, 377-78 (6th Cir. 2005). Under the plain error test, "'before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4)

the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 378  (internal quotations omitted).

Both Defendants allege that the district judge's reliance on the amount of intended loss to increase their sentences violates *Booker* because it was a judge-found fact. *Booker* held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt" or else the Sixth Amendment is violated. *Booker*, 543 U.S. 220, 125 S. Ct. at 756.  We have found that three factors must be present for an amount of loss to be considered for purposes of sentencing under U.S. Sentencing Guidelines Manual § 2B1.1(b)(1):  "First, . . . the defendant must have intended the loss.  Second, it must have been possible for the defendant to cause the loss.  Third, the defendant must have completed or been about to complete but for interruption, all of the acts necessary to bring about the loss." *United States v. Watkins*, 994 F.2d 1192, 1196 (6th Cir. 1993) (applying § 2F1.1, which was deleted and consolidated with § 2B1.1 in 2001).  We have emphasized that "the intended loss must have been possible to be deemed relevant," which means that it must "'reflect economic reality.'" *Id.* (quoting *United States v. Kahn*, 969 F.2d 218, 221 (6th Cir. 1992)).  Therefore, "[r]egardless of the defendant's intent, the defendant may not be sentenced on the basis of harm that he or she was incapable of inflicting." *Id.* (citing *Kahn*, 969 F.2d at 221).

In this case, the judge rather than the jury found these additional requirements necessary to establish intended loss for sentencing purposes, and this amounts to plain error in violation of the Sixth Amendment under *Booker* because the Defendants were sentenced beyond the maximum supported by the jury verdict.[10]  *See Oliver*, 397 F.3d at 377-80.  That the amount of intended loss was included in the indictment on which the jury found Defendants guilty does not absolve these sentences from Sixth Amendment contravention as the jury did not find that the loss involved was "possible" or that the Defendants "completed or [were] about to complete but for interruption, all of the acts necessary to bring about the loss" — both of which are necessary to determine intended loss. *Watkins*, 994 F.2d at 1196.  Moreover, given that *Booker* "makes clear that the Sentencing Guidelines are now advisory, giving the sentencing judge substantially more discretion to sentence above and below the Guideline range," *Jones*, 399 F.3d at 650 (citing *Booker*, 543 U.S. 220, 125 S. Ct. at 767), the trial judge erred in treating the guidelines as mandatory in determining that the Defendants' sentences required a sixteen-level upward adjustment based on the amount of intended loss.  Therefore, we remand as to both Defendants for resentencing consistent with *Booker*.

Crittenden also claims error in the increase in his sentence due to the judge's findings that he obstructed justice and played an aggravating role in the crime.  As these were judge-found facts that increased the sentence beyond the maximum authorized by the jury verdict,[11] this amounts to plain error. *See Oliver*, 397 F.3d at 377-80; *see also United States v. Alva*, 405 F.3d 383, 385 (6th Cir. 2005) (holding that enhancement based on judge's finding of obstruction of justice was plain error in violation of Sixth Amendment); *United States v. Moncivais*, 401 F.3d 751, 757-58 (6th Cir. 2005) (holding that enhancement based on judge's finding of defendant's aggravating role in offense

---

[10]The sentence under the guidelines without this intended-loss finding is one to seven months for Crittenden and two to eight months for Blood, and with the finding is forty-six to fifty-seven months for Crittenden (without considering the other enhancements) and fifty-one to sixty-three months for Blood. *See* U.S. Sentencing Guidelines Manual § 2B1.1(b)(1)(I) (advising that sixteen levels be added for an intended loss of more than one million and less than two-and-a-half million dollars); *id.* at ch. 5 pt. A (sentencing table).

[11]The sentencing range authorized by the jury verdict is one to seven months based on a level six offense and a category II criminal history. *Id.* at ch. 5 pt. A.  The upward enhancement was two levels each for the judge-found obstruction of justice, *id.* § 3C1.1, and for the aggravating role in the crime, *id.* § 3B1.1.  With both of these upward enhancements, the sentencing range would be eight to fourteen months. *Id.* at ch. 5 pt. A.

was plain error in violation of Sixth Amendment).  Accordingly, these factors also require that we remand to the district court to resentence Crittenden consistent with *Booker*.

Blood claims that the district judge's reliance on his prior conviction in determining his sentence constitutes a Sixth Amendment violation.  However, as the Supreme Court found in *Apprendi*, and reaffirmed in *Booker*, enhanced sentencing based on prior criminal history is permissible under the Sixth Amendment. *Booker*, 543 U.S. 220, 125 S. Ct. at 748 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions on all grounds, **VACATE** the Defendants' sentences, and **REMAND** as to both Defendants for resentencing consistent with *Booker*.